## STANDARD CAP & SEAL CORPORATION
### v. COE, Com'r of Patents.
### No. 7664.

United States Court of Appeals for the District of Columbia.

Decided Nov. 27, 1941.

Mr. M. Theodore Simmons, of New York City, for appellant; and Mr. Norman B. Frost, of Washington, D. C., entered an appearance for appellant.

Mr. Edwin L. Reynolds, of Washington, D. C., U. S. Patent Office with whom Mr. W. W. Cochran, Sol., U.S. Patent Office, of Washington, D. C., appeared on the brief, for appellee.

Before GRONER, Chief Justice, and MILLER and RUTLEDGE, Associate Justices.

MILLER, Associate Justice.

This is a consolidated appeal from three judgments of the District Court dismissing appellant's complaints in three actions brought under Section 4915, R.S.,[1] and consolidated for trial in that court. The Patent Office rejected the disputed applications for lack of invention over the prior art, and the District Court reached a similar conclusion. The three actions were based upon two applications by Oliver C. Irwin, and an application by Lester P. Barlow and Forrest E. Gilmore. Appellant is the assignee of each application.

Briefly stated, appellant's contention, on this appeal, is that Irwin is the pioneer in the development of what it calls "a practical system of refrigerated transportation * * * ;" that his application No. 632,740 contains the original conception of the development and the broader claims; that his application No. 632,741 contains a modification of the manner of pre-cooling the refrigerant before it is placed in the evaporator of the refrigerating apparatus which is installed in trucks or other vehicles; that the Barlow and Gilmore application relates to "an extension of the system and to some important details."

[1] 35 U.S.C.A. § 63.

Concerning the first Irwin application, No. 632,740, the District Court found: "2. The Irwin application discloses a refrigerating system for a large number of trucks each having thereon only the evaporator and absorber of an absorption refrigeration system. The trucks periodically call at a centrally located station, at which the remainder of the absorption system apparatus is located, and the truck apparatus and station apparatus are interconnected so that strong aqua ammonia solution [strong liquor] circulates from the truck absorber to the station generator where the ammonia gas is distilled off and a weak aqua ammonia solution [weak liquor] remains, and anhydrous ammonia and weak aqua solution circulate into the truck evaporator and absorber, respectively. During cooling of the truck the weak aqua solution absorbs the ammonia from the evaporator, thereby producing the strong solution. At the central station the ammonia gas from the generator is condensed, and the condensed ammonia is specially cooled to or below the temperature at which it is to be used in the truck. After definite amounts of ammonia and weak solution have been received in the truck apparatus, the truck and station apparatuses are disconnected from each other whereupon the truck is ready for refrigerated operation independently of the central station for some predetermined period of time, after which the truck and station apparatus must be again interconnected for recirculation of the fluids."

As to these disclosures of the first Irwin application, appellant claims invention upon four features, which it contends were not disclosed by the prior art and which it describes in its brief as (1) " * * * an entirely new means for and operation of refrigerated transportation," which solved many problems which are not present in either a conventional, unitary, absorption system of refrigeration, or in a mere division thereof; (2) " * * * physical changes necessary in the absorption system * * *"

for which "Irwin had to provide (a) a large and new type of absorber and arrange the same for air cooling, which the engineers believed would be impracticable; (b) a new type of evaporator having greatly enlarged capacity and operating as an evaporator without the conventional expansion valve; (c) the necessary disconnecting couplings and valves to be used when truck and stationary plant are joined together and when separated; (d) for the direct and quick handling of large amounts of ammonia, strong liquor and weak liquor, requiring the use of receivers and pumps for these respective liquors between the generator on the one hand and the evaporators and absorbers of the truck on the other hand so that the trucks would not be delayed at the central station all the time the ammonia was being recovered; and (e) a type of temperature regulator for the truck body, dependent upon the pressure in the evaporator;" (3) " * * * providing for pre-cooling of the ammonia at the central station before it is supplied to the evaporator. This pre-cooling means dissipation of the heat of the liquid. A body of ammonia in an evaporator like Irwin's will expend a certain amount of the ammonia to cool itself before it begins to do useful work of cooling the refrigerator. Irwin does this part of the operation at the central plant, and thereby saves between 18 and 20 percent of the space and weight of ammonia that otherwise would be necessary in the truck;" (4) providing "control of the operations of the reclaiming station and of the vehicles so as to insure uniformity of results."

The District Court concluded that no invention lay in any of these features, or in the claims describing them. In reaching this conclusion it relied upon the McMahon patent No. 367,992,[2] the Miller et al patent No. 1,729,082,[3] the Molesworth et al. patent No. 1,750,763,[4] the Chadwick patent No. 1,898,616,[5] the Backstrom patent No. 1,996,-

2 "The McMahon patent No. 367,992, discloses a plant in which ammonia is distilled from a rich solution to be used in an ammonia motor or a refrigerating unit, the rich solution resulting from the use of such ammonia being returned to the distilling means."

3 "The Miller et al patent No. 1,729,082 shows a railway car, the storage compartment of which is cooled by an evaporator, connected to an adsorber that is cooled by outside air."

4 "The Molesworth et al patent No. 1,750,763 discloses a refrigerating unit for home use (and mentions railway cars) comprising means for storing and evaporating ammonia and a tank containing liquid in which the ammonia is absorbed. Connections are provided for supplying ammonia and for removing the liquid from the absorber."

5 "The Chadwick patent No. 1,898,616 discloses the use of an air-cooled generator-absorber in a refrigerating unit."

094,[6] and the British patent to Tellier, No. 10,156, A. D. 1900.[7] The court's findings, as to each of the references, are set out in the margin. It held, as to the more general claims, that they are drawn to a mere aggregation of a means for preparing liquid ammonia and a means for using ammonia to produce refrigeration. It held, further, (1) that the disclosure concerning the use of refrigerating units on trucks or railway cars constituted an adaptation of the system described by Tellier and that this was not invention in view of the Miller and Molesworth disclosures; (2) that it was not invention to air-cool the absorbers disclosed by Tellier, in view of the Chadwick patent and the Miller patent; (3) that it was not invention to pre-cool the liquid ammonia at the central plant of Tellier, in view of the Backstrom patent; (4) that it was not invention to provide temporary connections between the refrigerating unit and the central plant of Tellier, instead of transporting the liquids between them by means of a cart; (5) that it was not invention, in operating the Tellier system, to supply each refrigerating unit with a predetermined amount of ammonia corresponding to the amount reclaimed from the strong solution resulting from the previous operation of the unit.

A careful examination of the record fails to reveal any evidence which would justify us in disregarding the trial court's findings, or in concluding that either its determination or that of the expert administrative officers of the Patent Office was wrong. The conventional absorption refrigeration system is stationary. It consists of a reclamation unit and a refrigeration unit, which are referred to colloquially as the "high side" and the "low side," respectively. In the Irwin system the two sides are disconnected; one portion, the low side, travels with the truck or other vehicle; the high side remains at a central servicing station; appropriate connections are provided for use in servicing. With minor variations each side operates in the same manner as it would in the conventional system. The high side acts merely as a recovery or reclamation plant for resolving strong liquor into liquid ammonia and weak liquor. The low side acts merely as a refrigerating unit by vaporizing liquid ammonia. The reclaiming plant and the absorption refrigeration units of the Tellier patent are both stationary. The transfer of liquids between them is effected by using what he called a "transporter." This differs from Irwin's claim, aside from details of construction, only in that in the Irwin system the refrigerating units are mobile, being mounted on railway cars or trucks, and are brought to the reclaiming plant for the purpose of transferring the liquids between them. This would seem to be an obvious procedure.[8] And, when this has been done, the devising of valves and couplings to connect the sides is simply a matter of mechanical skill.[9]

In fact, as the Examiner suggested, the contention that a patentable combination is disclosed by Irwin's application is little more persuasive than would be the contention that there is combination in a patentable sense between the multiplicity of automobiles running about the highways and the service stations at which they receive gasoline, oil, water, grease and air. To carry the analogy one step farther, the fact, urged by appellant, that some materials are

---

[6] "The Backstrom patent No. 1,996,094 discloses a refrigerating system including an evaporator from which a portion of the ammonia is evaporated for the purpose of cooling the remaining liquid as it is supplied to a second evaporator."

[7] "The British patent to Tellier, No. 10,156, A. D. 1900, discloses a reclaiming plant in which a strong solution is heated to drive off ammonia gas which is purified and condensed. This liquid ammonia, together with the weak solution remaining after its liberation, is distributed by a cart among a number of refrigerating units, the weak solution being placed in the absorbers of such units. The cart also returns the strong solution resulting from the previous refrigerating operation to the central plant."

[8] Hendy v. Golden State & Miners' Iron Works, 127 U.S. 370, 375, 8 S.Ct. 1275, 32 L.Ed. 207; Hug v. Lakewood Engineering Co., D.C.N.D.Ohio, 291 F. 892, 894, affirmed, 6 Cir., 7 F.2d 98.

[9] In re Garrett, 27 App.D.C. 19, 23: "The change in the relative location of the various elements of the apparatus is nothing more than would suggest itself to a skilled mechanic having in view the conditions and conveniences of the different places in which the construction and use of the apparatus may be desired." Cf. Altoona Publix Theatres, Inc. v. American Tri-Ergon Corp., 294 U.S. 477, 483, 484, 55 S.Ct. 455, 79 L.Ed. 1005; Minnesota Mining & Mfg. Co. v. Coe, 69 App.D.C. 217, 220, 99 F.2d 986, 989; Vulcan Corp. v. Slipper City Wood Heel Co., 6 Cir., 89 F.2d 109, 110.

recovered, reconditioned and later reused in other trucks, adds little more to the proper conception of a patentable combination than docs the fact that automobile tires and batteries are traded in for new ones at some service stations, to be reconditioned and sold to other automobile owners.

■ The Patent Office correctly held,[10] therefore, that: " * * * the association [in Irwin's application No. 632,740] of these two separate and distinct functions considered either in terms of method or appropriate apparatus does not constitute a true dependable cooperable conception of combination either as method or apparatus within the provisions of the patent statutes."[11] Each phase of the operation described by Irwin is old. Ingenuity may have been required to effect the combination and secure the total result, but no more than that to be expected of one skilled in the prior art.[12] It fell far short of invention.[13]

As for appellant's contention that Irwin's application No. 632,740 discloses invention in its provision for pre-cooling liquid ammonia in the central plant before it is introduced into the evaporator, the Backstrom patent No. 1,996,094 speaks in express terms of "pre-cooling of the liquid entering the evaporator * * *." Moreover, it is suggested by both Molesworth and Tellier.

Appellant contends, also, that it was invention for Irwin to provide for supplying each refrigerating unit with a predetermined amount of ammonia of a definite degree of purity, which amount corresponds to the amount to be reclaimed from the strong liquor resulting from the previous operation of the unit. This is alleged to be important "because a central station may be servicing trucks of many different owners, each hauling different products requiring different degrees of cooling. Furthermore, those trucks may be calling at different central stations. Again, a truck should receive no more ammonia than it is giving to the station so that there will be sufficient supplies for all to have uniform refrigeration for the period contracted for." However, this disclosure was anticipated by Tellier. His travelling vehicles are "provided with an apparatus suitable for measuring liquids" which "allows of ascertaining the quantities [of liquid ammonia] supplied * * *" to the refrigerating unit. His patent also provides that this measurement may be "verified by a lever placed on the vessel * * *" which receives the ammonia. Appellant contends that Tellier merely charges the refrigerating unit with an amount of ammonia which is measured without reference to the ammonia content of the strong liquor extracted from the absorbers. It urges that even if this were done, it would not be accurate, because in the Tellier absorber there are three tanks for strong liquor, only one of which is drained at a time. However, appellant's expert testified that the whole Tellier system could be drained of the strong liquor, thereby permitting measurement of the strong liquor extracted. The necessity of inserting an accurate charge of liquid ammonia in the evaporator having arisen, the next step of measuring the ammonia content of the strong liquor and the use of suitable controls in the receiving vessels would seem obvious. Thus, any differences which exist are only such as would occur to one with engineering experience when confronted by the problem of operating the Tellier system in mobile units.[14]

■ The second judgment, from which this consolidated appeal was taken, involved Irwin's application No. 632,741. The claims in suit were numbered 2, 4, 5, 10, 20 and 23. All of them relate to mechanism at the central station, designed for pre-cooling the ammonia before it is supplied to the trucks; and all of them were

[10] Appellee's Exhibit No. 1-I, Record 276, 281.

[11] Hailes v. Van Wormer, 20 Wall. 353, 368, 22 L.Ed. 241; Powers-Kennedy Contracting Corp. v. Concrete Mixing & Conveying Co., 282 U.S. 175, 186, 187, 51 S.Ct. 95, 75 L.Ed. 278; Lincoln Engineering Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008; Frick-Gallagher Mfg. Co. v. Ro-Tray Corp., 74 App.D.C. 315, 122 F.2d 81, 83; In re Harris, 37 App.D.C. 374, 378–379. Cf. Ruben Condenser Co. v. Copeland Refrigeration Corp., 2 Cir., 85 F.2d 537, 541, certiorari denied, 300 U.S. 665, 57 S.Ct. 508, 81 L.Ed. 873, quoted in Radtke Patents Corp. v. Coe, 74 App.D.C. 251, 122 F.2d 937, 948.

[12] Cuno Engineering Corp. v. Automatic Devices Corp., 62 S.Ct. 37, 86 L.Ed. ——.

[13] Cf. Tropic-Aire, Inc. v. Sears, Roebuck & Co., 8 Cir., 44 F.2d 580, 588, certiorari denied, 282 U.S. 904, 51 S.Ct. 217, 75 L.Ed. 796.

[14] Concrete Appliances Co. v. Gomery, 269 U.S. 177, 184, 185, 46 S.Ct. 42, 70 L.Ed. 222.

rejected by the District Court. On this appeal appellant cites, as representative of the issues, claim 23, which reads as follows: "An absorption refrigeration system comprising a generator adapted to receive a substance that is a combination of absorbent and refrigerant, means for heating the generator to drive off the refrigerant, a condenser for the refrigerant, a storage tank for the condensed refrigerant, and means connected between the storage tank and the condenser for lowering the temperature of the refrigerant in the storage tank." The question presented here is whether Irwin, reading the prior art as disclosed by Tellier, was required to do more that what should be expected of a skilled mechanic, in producing the result described in his claim 23.[15] Appellant says yes; the experts at the Patent Office said no; and the trial court, weighing in the balance all the evidence before it, including the presumption of correctness which follows the decision of the Patent Office,[16] reached the conclusion that Irwin's achievement fell short of invention. We have no reason for disturbing its conclusion.

Although appellant has cited, on this appeal, claim 23 as being representative, issue was actually joined in the lower tribunals upon claim 2[17] and it is so nearly identical with claim 23 that the evidence concerning one is equally applicable to the other. The decision of the Board of Appeals of the Patent Office reads as follows upon this issue:

"Claim 2 has been rejected as being directly readable on Fig. 4 of the patent to Tellier. The examiner has applied claim 2 term by term to the patent to Tellier. It is understood that the reference to the heater (4) in the examiner's statement is intended to refer to the heater 40 of Tellier. The tank 50 of Tellier accumulates condensed refrigerant in considerable quantity. The ammonia in tank 50 is said to be redistilled from that tank by reducing the

back pressure. This results in reduction in temperature and it seems that tank 50 may also be used to cool brine coils. The vaporized ammonia is again recompressed in the compressor 52 and cooled in the cooler and condenser 53 and collected in the storage tank 55. While the drawing off of volatilized ammonia from tank 50 by tube 51 through compressor 52 serves the purpose of reducing the temperature in the tank 50, the body of cooled ammonia is not directly transferred to a refrigerating chamber. However, the terms of claim 2 are satisfied by Tellier and we hold further that invention is not involved in pre-cooling the liquid ammonia which is to be introduced into the refrigerating chamber of applicant's device in order to avoid carrying into the refrigerating chamber any unnecessary heat. It does not seem that the mere sensible heat in connection with the specific heat of liquid ammonia would be of much appreciable quantity in this relation, but it is believed to be clearly an apparent feature that, if worth considering, it is a matter that is entirely obvious. We think it is no more than merely the same conception as pre-cooling meats or other products which are to be loaded into refrigerator cars in order to take as much burden off the refrigerating element of the car as possible. This is believed to be a matter of public knowledge."

Appellant asserts the contrary and relies upon the testimony of its expert witness, Mr. Muffly, to support its assertion. But Mr. Muffly was not asked whether it is impossible to read claim 2 or claim 23 of Irwin upon Tellier and did not so testify. While his testimony was so phrased as to make possible a contention such as that now urged, the questions and answers were so phrased as to avoid the expression of a conclusion upon this point. In any event, it is not for us to say whether, upon an independent investigation of all the evidence, we would or might have reached a differ-

---

[15] Minnesota Mining & Mfg. Co. v. Coe, 69 App.D.C. 217, 220, 99 F.2d 986, 989; Minnesota Mining & Mfg. Co. v. Coe, 69 App.D.C. 256, 257, 100 F.2d 429, 430; L. Sonneborn Sons, Inc. v. Coe, 70 App. D.C. 97, 100, 104 F.2d 230, 233.

[16] Abbott v. Coe, 71 App.D.C. 195, 197, 109 F.2d 449, 451; Cleveland Trust Co. v. Berry, 6 Cir., 99 F.2d 517, 522. Cf. Morgan v. Daniels, 153 U.S. 120, 125, 14 S.Ct. 772, 38 L.Ed. 657, quoted in Bayer v. Rice, 64 App.D.C. 107, 108, 75 F.2d 238, 239.

[17] "An absorption refrigeration system comprising a generator adapted to receive a substance that is a combination of absorbent and refrigerant, means for heating the generator to drive off the refrigerant, a condenser for the refrigerant, a tank for the accumulation of condensed refrigerant, and a compressor that is connected to the storage tank so as to lower the temperature of the refrigerant that is stored therein."

ent conclusion.[18] Neither is it our function to determine the preponderance of conflicting evidence, other than to determine whether there was substantial evidence to support the trial court's decision.[19] We have no doubt that there was.

The third phase of this appeal concerns the claims of the Barlow and Gilmore application, none of which were allowed by the Patent Office or by the District Court. Barlow and Gilmore succeeded Irwin in the development of appellant's refrigerating apparatus. The problem which they sought to solve is described by appellant as follows: "In the course of the development work, Barlow and Gilmore discovered that certain definite limits on the quality of the ammonia and of the weak liquor absorbent would be necessary for successful commercial operation of the Irwin or General Frigid system, especially where long over-the-road operations were to be engaged in. They determined that the ammonia would have to be nearly anhydrous, with a low limit of ninety-five percent, and a preferred limit of ninety-seven or ninety-eight percent, which were limits not before used, in view of Mr. Gilmore's testimony that it was not possible for them to obtain equipment with guaranties of such performance. They likewise determined that the weak liquor could have not more than five percent contamination of ammonia, and preferably three percent. Barlow and Gilmore also found that it would be necessary to eliminate at the central stations every human factor of possible error in the amount of ammonia and in the amount of weak liquor put into the evaporator and absorber of each truck or railway car, and they therefore added to the absorbers and evaporators devices for automatically limiting the amount of charge."

In order to solve the problem, their application proposes to equip the evaporator and absorbers on each mobile unit with devices to permit them "to be charged to a definite extent, such as a predetermined

level. Therefore when the absorbers are emptied, they are recharged to a predetermined level so that at each recharging there is a definite known quantity of absorbent going into the absorbers. Also, according to the present system the remaining unspent charge or refrigerant in the evaporator is not discharged but is left in the evaporator and the evaporator is recharged to the predetermined level. Thus, if only half of the charge of refrigerant has been spent during the service run of the transportation unit, only that amount of refrigerant is added to the evaporator, and that amount corresponds to the amount of spent refrigerant that has gone over to the absorbers during the service run and that is taken off from the absorbers when emptying the same. Of course, in referring to filling the evaporator and absorbers to a predetermined level it is not intended to be limited to that specific method as there are several other ways by which the desired result may be accomplished." It is also proposed to operate the recovery plant so "as to produce substantially anhydrous ammonia of a predetermined dryness or specific gravity. Likewise, the weak liquor or aqua ammonia will be reduced to a predetermined ammonia content. Accordingly, knowing that the absorbent with which the absorbers are charged is of a definite ammonia content and knowing that the anhydrous ammonia with which the evaporators are charged is of a certain definite quality throughout the refrigeration system for the entire territory or nation, then it will be known that the amount of ammonia taken from the absorbers of any transportation unit contains the exact equivalent to the amount of ammonia that is necessary to recharge the evaporator of that unit fully to its intended refrigerative capacity."

The District Court concluded that no invention was shown over Tellier. A careful reading of the record demonstrates that it reached the correct conclusion.[20]

Affirmed.

---

[18] Abbott v. Coe, 71 App.D.C. 195, 197, 109 F.2d 449, 451: "The question for us is not whether in our opinion there was invention, but whether the finding that there was none is consistent with the evidence.", quoted in Wolf v. Coe, 72 App.D.C. 224, 112 F.2d 857, and in Eppensteiner v. Coe, 72 App.D.C. 169, 114 F.2d 457; Radtke Patents Corp. v. Coe, 74 App.D.C. 251, 122 F.2d 937; Krause v. Coe, 74 App.D.C. 47, 120 F.2d 717, 719.

[19] Levine v. Coe, 73 App.D.C. 242, 119 F.2d 185, 187; Forward Process Co. v. Coe, 73 App.D.C. 100, 116 F.2d 946, 947; Nichols v. Minnesota Mining & Mfg. Co., 4 Cir., 109 F.2d 162, 163, 164: "We review such findings of the District Judge, just as in other cases, under the rule that they must be accepted by us unless clearly erroneous. Rule 52(a) of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c; * *."

[20] Cf. Levine v. Coe, 73 App.D.C. 242, 244, 119 F.2d 185, 187.