**POTTS et al. v. COE, Com'r of Patents.**
No. 8189.

United States Court of Appeals
District of Columbia.

Argued April 15, 1943.

Reargued Oct. 15, 1943.

Decided Jan. 18, 1944.

Mr. Harold B. Whitfield, of Chicago, Ill., with whom Mr. Cecil B. Hamilton, of Washington, D. C., was on the brief, for appellants.

Mr. E. L. Reynolds, U. S. Patent Office, of Washington, D. C., with whom Mr. W. W. Cochran, Solicitor, U. S. Patent Office, of Washington, D. C., was on the brief, for appellee.

Before MILLER, EDGERTON and ARNOLD, Associate Justices.

ARNOLD and MILLER, Associate Justices.

This is a suit (under R.S. § 4915, 35 U.S.C.A. § 63) to obtain a patent. The invention claimed is an automatic stock quotation board for use in stock brokers' offices. It is operated from a central station and is capable of giving nationwide service. It is a substitute for the older type of board on which quotations are written by hand.

The board can be operated over a single wire, using the equal length electrical impulses which are familiar in telegraphy. Its novelty consists of elaborate mechanisms for selecting these impulses so that they will produce the proper letters and figures on the board. It is the first automatic stock market board which has had any commercial success. Patents were granted on some of the claims made in the application. These are not before us. The rejected claims which are in issue in this case attempt to cover a communications system which uses single impulse signals to display letters and figures on the board.

Applicants in their brief set out two claims which they rely on as typical and show the novel features by italics:

"147. A communication system comprising a transmitting station, a receiving station, and a single channel of communication between said stations, *means at said transmitting station for sending isochronous messages made up of equal length impulse intervals, certain of said intervals predetermined for primary selection, certain others for secondary selection, and certain others for ultimate operation,* a plurality of groups of indicators at said receiving station representing a number of groups of stock classifications, *means responsive to the first mentioned of said impulse intervals for selecting one group of the plurality of groups of indicators, means responsive to the second mentioned of said intervals for selecting one of the indicators of the selected group, and mechanism responsive to the last mentioned of said intervals of impulses for operating the selected indicator.*

"172. In a stock quotation distribution system, a plurality of character carrying devices for each stock item whose quotation is to be displayed with certain devices allocated to range classifications of the quotation, *means responsive to a quotation message comprising groups of equal length code combinations of signal intervals, one group of which conveys information relative to the stock item to be quoted, another group of which conveys information relative to the price thereof, and a further group of which conveys information relative to the range or character of the item, means operated by said responsive means for translating said first and third recited groups into selective conditions for selecting a character carrying device for operation, and means for translating said second group into mechanical operations for actuating the selected character carrying device.*"

In rejecting appellants' claims the Patent Office held that they represented simply a combination of ideas disclosed in former patents. It found that the improvements which had been added to make the design commercially profitable required a high degree of skill in the art of communications, but not invention. The findings of the District Court are in agreement with those of the Patent Office.

This Court has held that where a trial court finds lack of invention, thereby sustaining the decision of the Patent Office, that finding will not be disturbed unless actually inconsistent with the evidence. Therefore, the only question before us is whether the evidence here is sufficient to rebut the strong presumption in favor of the Patent Office and the trial court. The record shows that the appellant Potts, who claims to be the inventor, is an employee of the Teletype Corporation and has assigned his patent rights to that corporation. Public records disclose that the Teletype Corporation is a wholly owned subsidiary of West-

ern Electric. Western Electric, in turn, is a manufacturing subsidiary owned and controlled by the American Telephone & Telegraph Company. Since 1920 the appellant has been a member of the research staff of a subsidiary of the Bell System.

The organization, activities, and control of the Bell System are matters of public record.[1] It is an interlocking group of companies, controlled by the American Telephone & Telegraph Company. Through its subsidiaries it controls between eighty and ninety per cent of local telephone service and ninety-eight per cent of the long distance telephone. wires of the United States. It furnishes nearly all the wire facilities used in radio program transmission. Through its patents on teletypewriter machines, it dominates a service which to a large extent has supplanted ordinary telegraph service. News telephoto service is dependent on Bell plants. Telephone service across the ocean is a monopoly with the Bell System.

The dominance of the Bell System extends beyond the regulated field of communications. Through its subsidiaries it manufactures more than ninety per cent of the telephone equipment in the United States. It owns and controls a large number of patents not only for instruments used in communications but also in the electrical arts, including radio transmitting and receiving equipment, therapeutic devices, audiphones, public address equipment for outdoor and indoor use, photoelectric cells and race timing equipment. In many of these products the Bell System has a dominating position and sometimes a controlling position by virtue of the control or exclusive licensing of patents.

This position both in and outside the communications field has been maintained in part through the expenditure of vast sums on engineering research. $242,541,-569 was spent for these purposes between 1916 and 1935, which is probably more than the total budget of any university in the United States during this period. Electronic physics, chemistry, applied mathematics, optical phenomena and other fields of inquiry are under constant study.

All patents on devices discovered in its laboratories are assigned to some unit of the Bell System. Thus in large part through its research facilities the Bell System has come to own or control over 9,000 United States patents. It is licensed under nearly 7,000 more. In these research laboratories about 4500 people are employed, half of whom are engineers, chemists, metallurgists and physicists. They represent nearly all the best talent in the field. In addition to research in laboratories the Bell System has made arrangements with other groups for mutually exclusive exchange of information which is available to no independent inventor.

In determining whether an invention[2] has been made the character of the article or process, its novelty, and its advance over the prior art are merely evidentiary. The ultimate question is the character of the contribution made by the inventor. There is no invention without inventive genius. The objective advance does not identify or evaluate the individual achievement.[3] The individual achievement is becoming more and more difficult to identify and evaluate as organized research becomes our greatest source of invention. And so the trend of recent decisions has

---

[1] Report of the Federal Communications Commission on the Investigation of the Telephone Industry in the United States, made pursuant to Pub. Res. No. 8, 74th Congress. House Doc. No. 340, 76th Cong., 1st Sess. (1939).

[2] One judge, with perhaps too disarming frankness, has said that the judicial estimate is a matter of feeling rather than logic. Warren Telechron Co. v. Waltham Watch Co., 1 Cir., 1937, 91 F.2d 472, 473.

[3] Learned Hand, J.: "* * * we take no recourse to any supposed absolute objective test, * * * we think that such tests are delusive, if used as more than rough rules for guidance. The question is one of evidence in each case, and the is-

sue necessarily depends upon a shifting standard, just as in cases of due care.

"Objective tests may be of value vaguely to give us a sense of direction, but the final destination can be only loosely indicated. An invention is a new display of ingenuity beyond the compass of the routineer, and in the end that is all that can be said about it. Courts cannot avoid the duty of divining as best they can what the day to day capacity of the ordinary artisan will produce. This they attempt by looking at the history of the art, the occasion for the invention, its success, its independent repetition at about the same time, and the state of the underlying art, which was a condition upon its appearance at all.

been to emphasize more and more the character of the individual achievement rather than the qualities of the product in determining patentability. We have held that a step forward which, considered in connection with the highly developed condition of the art, might reasonably be expected from the research of highly trained specialists is not invention.[4] Thus neither the result of great industry in experimental research[5] nor the successful product of a gradual process of experimentation[6] over a period is invention. Routineering, even by the most highly trained specialists, step by step improvements,[7] the carrying forward of a new and more extended application of the art,[8] are not invention.[9]

Yet, when all is said, there will remain cases when we can only fall back upon such good sense as we may have, and in these we cannot help exposing the inventor to the hazard inherent in hypostatizing such modifications in the existing arts as are within the limited imagination of the journeyman. There comes a point when the question must be resolved by a subjective opinion as to what seems an easy step and what does not. We must try to correct our standard by such objective references as we can, but in the end the judgment will appear, and no doubt be, to a large extent personal, and in that sense arbitrary." Kirsch Mfg. Co. v. Gould Mersereau Co., Inc., 2 Cir., 1925, 6 F.2d 793, 794.

In the report of the National Patent Planning Commission (on which the Commissioner of Patents serves as Executive Secretary) we find a recommendation for "the enactment of a declaration of policy that patentability shall be determined objectively by the nature of the contribution to the advancement of the art, and not subjectively by the nature of the process by which the invention may have been accomplished." [The American Patent System, Report of the National Patent Planning Commission, p. 15 (1943)]. Whatever one may think of the wisdom of such a recommendation it affirmatively shows that the Commission recognizes that legislation is required before we may ignore the subjective test in evaluating the inventor's contribution.

4 Sinclair Refining Co. v. Coe, 1943, 78 U.S.App.D.C. ——, 138 F.2d 673. "Obviously, if the problem which Donner solved was one which could have been solved by the ordinary chemist skilled in the art working toward the same end and under like conditions, what Donner did was not invention." Donner v. Sheer Pharmacal Corp., 8 Cir., 1933, 64 F.2d 217, 221, certiorari denied 290 U.S. 658, 54 S.Ct. 73, 78 L.Ed. 570; quoted in Minnesota Mining & Mfg. Co. v. Coe, 1938, 69 App.D.C. 217, 220, 99 F.2d 986, 989.

5 Minnesota Mining & Mfg. Co. v. Coe, supra, note 4. See note 5 of that opinion, quoting Atlantic Works v. Brady, 1883, 107 U.S. 192, 199, 200, 2 S.Ct. 225, 27 L.Ed. 438: "The process of development in manufactures creates a constant demand for new appliances, which the skill of ordinary head-workmen and engineers is generally adequate to devise, and which, indeed, are the natural and proper outgrowth of such development. Each step forward prepares the way for the next, and each is usually taken by spontaneous trials and attempts in a hundred different places. To grant a single party a monopoly of every slight advance made, except where the exercise of invention somewhat above ordinary mechanical or engineering skill is distinctly shown, is unjust in principle and injurious in its consequences."

6 Rembert v. Coe, 1943, 78 U.S.App.D. C. ——, 136 F.2d 793; L. Sonneborn Sons, Inc., v. Coe, 1939, 70 App.D.C. 97, 104 F. 2d 230, 233.

7 Radtke Patents Corp. v. Coe, 1941, 74 App.D.C. 251, 122 F.2d 937, 954.

8 Standard Cap & Seal Corp. v. Coe, 1941, 75 U.S.App.D.C. 60, 124 F.2d 278, 281.

9 "* * * Ingenuity was required to effect the adaptation, but no more than that to be expected of a mechanic skilled in the art.

"Strict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art." Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 91, 92, 62 S.Ct. 37, 41, 86 L.Ed. 58.

As pointed out in a report published by the Temporary National Economic Committee of 1938: "All inventions derive from common knowledge; they differ in the quality and magnitude of their contributions to the industrial arts. As respects origin they fall into three rather distinct classes: First, creations which exhibit individual insight; second, derivative processes, worked out by professional staffs, equipped with laboratory facilities; third, variations upon a basic design such as a dozen workmen would independently contrive. The mark of the first is genius; of the second, professional competence; of the third, mechanical ability. It was patience on the part of the man of genius which the Constitution wished to reward; the mere display of capacity to contrive has been repeatedly frowned upon by the United States * * * Supreme Court." Hamilton, Patents and Free Enterprise, p.

474

In order to evaluate the contribution of the inventor the court must reconstruct the conditions under which he worked, with emphasis on the contribution of others. This method is sharply outlined in the case of Marconi Wireless Telegraph Co. v. United States,[10] because a different point of view was there considered and rejected by the Supreme Court. In his dissenting opinion Mr. Justice Frankfurter argued that inventions have always been "parts of an evolution, the culmination at a particular moment of an antecedent process."[11] He asserts that the majority was wrong in using "reconstruction by hindsight"[12] of the state of the art in such a way as to show that the final step made by Marconi was one which could have been made by an ordinary expert of high skill. He objects to the process by which "a judge of unusual capacity for understanding scientific matters is, by a process of intricate ratiocination, able to demonstrate that anyone could have drawn precisely the inferences that Marconi does * * *.[13] He repudiates the flash of genius doctrine which depends entirely upon an evaluation of individual accomplishment.[14] Nowhere is this point of view better stated. Yet the Court declined to accept it. Both the majority opinion, declaring the patent in question invalid, and Mr. Justice Rutledge, in a separate dissent,[15] are concerned only with an evaluation of the individual achievement of Marconi, considered in connection with the accomplishment of others in the field.

In other words, patents are not intended as a reward for a highly skilled scientist who completes the final step in a technique, standing on the shoulders of others who have gone before him. By the same token they are not intended as a reward for the collective achievement of a corporate research organization. Today routine experimentation in the great corporate laboratories can produce results beyond the imagination of twenty years ago. But such contributions to industrial art are more often than not the step by step progress of an entire group, not the achievement of an individual. Such an advance is the product not of inventive ability but of the financial resources and organizing ability of those who operate the laboratories.[16] The practice of requiring the expert employees of research organizations to assign in advance all their future patent rights to the organization, itself reflects the respective contributions of the organization and the individual to these so-called inventions. The "inventor" is paid only a salary, he gets no royalties, he has no property rights in the improvements which he helps to create.

To give patents for such routine experimentation on a vast scale is to use the patent law to reward capital investment, and create monopolies for corporate organizers instead of men of inventive genius.[17]

156, Mon. No. 31, Investigation of Concentration of Economic Power, Temporary National Economic Committee, 76th Cong., 3d Sess. (1941). (Apparent misprint deleted.)

10 1943, 320 U.S. 1, 63 S.Ct. 1393, 87 L.Ed. 1731.

11 Ibid., page 62 of 320 U.S., page 1421 of 63 S.Ct., 87 L.Ed. 1731.

12 Ibid.

13 Ibid., page 63 of 320 U.S., page 1422 of 63 S.Ct., 87 L.Ed. 1731.

14 Ibid.

15 Ibid., page 64 of 320 U.S., page 1422 of 63 S.Ct., 87 L.Ed. 1731.

16 Ruben Condenser Co. v. Copeland Refrigeration Corp., 2 Cir., 1936, 85 F.2d 537, 541: "But all new combinations are not patentable combinations. Especially in chemical and electrical experiments happy solutions may be reached by testing out variants reached merely by permutations of old elements. Possibly the patent law should protect such industrial achievements, but it does not; the work of the well-equipped laboratory which by trial and error checks off a series of formulas, may be the proper path of industrial advance, as the Germans found it to be before the Great War; but it does not demand what we call 'invention.' Something more personal to the inventor, something which better measures his imaginative powers, is required." Quoted in Rembert v. Coe, 1943, 78 U.S.App.D.C. ——, 136 F.2d 793, n. 4.

17 "* * * Mr. Justice Bradley in Atlantic Works v. Brady, 107 U.S. 192, 17 Otto 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438: "* * * an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the arts. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown lia-

The corporate research laboratory of to-day has given us the greatest invention of modern times, the knowledge of how to invent. Under a disorganized system of invention a hundred men would hunt for the needle in the haystack, the prize going to the successful finder while the efforts of the others served only to scatter the hay in all directions. Organized invention has changed the entire process. Each man is given a section of the hay to search. The man who finds the needle shows no more "genius" and no more ability than the others who are searching different portions of the haystack.

If we fail to take notice of these facts about modern industrial research we create a situation in which the corporate research laboratory may become a device to control the step by step progress of applied science.[18] Because the captive inventors in these great laboratories have no control over their patents, the corporation may distribute the very right to apply for a patent among its employees in accordance with sound business policy. And thus the research laboratory becomes a sort of sub-Patent Office, granting or withholding patents to its employees for considerations foreign either to the patent law or to the provision in the Constitution which author-izes it. Mr. Charles Kettering, head of one of our greatest research organizations, testifying in the Temporary National Economic Committee investigation, explains the operation of such a corporate sub-Patent Office:

"Mr. Cox. How many employees do you have in this organization?

"Mr. Kettering. About 500.

"Mr. Cox. Are they all engineers?

"Mr. Kettering. No; we have all types of men; we have physicists, mathematicians, engineers, and fine mechanics, and all that sort of thing.

"Senator King. They are all skilled men?

"Mr. Kettering. Yes.

"Mr. Cox. As a result of the work which you carry on in your organization, Mr. Kettering, or in your department, to be more precise, are inventions made on which patents are required?

"Mr. Kettering. Yes.

"Mr. Cox. And does General Motors take out those patents?

"Mr. Kettering. Yes.

"Mr. Cox. What arrangements does General Motors have with the employees with respect thereto?

bilities to lawsuits and vexatious accountings for profits made in good faith.' Cf. Mr. Justice Campbell dissenting in Winans v. Denmead, 15 How. 330, 344, 345, 347, 14 L.Ed. 717; Hamilton, Patents and Free Enterprise, Mon. No. 31; Investigation of Concentration of Economic Power, Temporary National Economic Committee, 76th Cong., 3d Sess., ch. VIII (1941)." Cuno Engineering Corp. v. Automatic Devices Corp., supra, note 9, page 92 of 314 U.S., page 41 of 62 S.Ct., 86 L.Ed. 58.

"Patentees have rights given them by law. 'But the public has rights also. The rights of both should be upheld and enforced by an equally firm hand, whenever they come under judicial consideration.'" Mr. Justice Black dissenting in Exhibit Supply Co. v. Ace Patents Corporation, 1942, 315 U.S. 126, 138, 62 S.Ct. 513, 519, 86 L.Ed. 736.

18 "Present objectives of research activities.—The company's present research activities apparently have a twofold objective: First, to advance and improve the art of wire telephony; and, second, to obtain a degree of knowledge, influence, and control in adjacent industries sufficient to protect the return upon private capital invested in its wire-telephone plant against diminution by the competition of emerging forms of communication. * * *

"A recent restatement of those objectives of company policy, in relation to the Bell System's sound motion-picture activities, is afforded by J. E. Otterson, the Bell System executive in charge of those activities which resulted from commercial exploitation of the devices resulting from fundamental research activities carried on by the American Co. * * * Otterson said:

"'A primary purpose of the American Telephone & Telegraph Company is the defense and maintenance of its position in the telephone field in the United States. Undertakings and policies must be made to conform to the accomplishment of this purpose.

"'The American Telephone & Telegraph Co. is surrounded by potentially competitive interests which may in some manner or degree intrude upon the telephone field.

"'The problem is to prevent this intrusion.'"

Report of the Federal Communications Commission on the Investigation of the Telephone Industry in the United States, made pursuant to Pub. Res. No. 8, 74th Congress. House Doc. No. 340, 76th Cong., 1st Sess. (1939), pp. 206–209.

"Mr. Kettering. We all sign the regular patent agreement that we have with an institution of that kind; we assign all the patents directly to General Motors.

"Mr. Cox. Is the employee who makes an invention of that kind rewarded in any way beyond his usual compensation?

"Mr. Kettering. We usually do; yes. You see, when you are working on an invention—well, *we don't work on inventions; we try to solve some industrial problem; try to make a new piece of apparatus.* Now, you never know what inventions are going to be useful and what are not, because as you come upon the problem, you can't tell what is important and what is not important, so we have to kind of study the whole thing on the whole front. It may go off at that angle or this angle. *What we would rather do is to try to reward the whole laboratory, to keep the individuals working together. If you gave the reward to a particular individual for his particular invention, then he would be secretive about the thing, so we try to reward the whole laboratory, if they do good. In other words, if he makes some things that are valuable, we reward the laboratory, because one department may make an important contribution one year and another department another year; but then we always give a little particular bonus to the fellow who did that job.*

"Mr. Cox. In other words, you have both a collective reward and an individual reward.

"Mr. Kettering. Yes. You have to keep the collective reward in order to keep the thing from crystallizing and segregating. A *one-man invention isn't very possible these days, because there are so many ramifications that we have to work together as a group.* I think that one of the hardest problems we have had is to get scientific men to sit down and work on a common problem, because their whole training has been individualistic, but if you get a good problem and can divide it up into a number of sections and assign the metallurgical department to the metallurgical part and assign another problem to the physicist and another to the chemist, and so forth, then our particular job is to correlate that so when their work comes together, it is the thing we are trying to get made. It works out pretty nice. You see our stuff fails so often; it is about 99 per cent failure, and our biggest problem is to keep the men enthusiastic, especially, a young fellow will

come in and set up something and develop it, and it doesn't work, then he is all down. We say, 'You are just an amateur failure; you have to learn how to fail over and over and over again,' but after they understand that, there is no trouble about working together then.

"Mr. Cox. That research is really carried on, then, as a collective enterprise?

"Mr. Kettering. It depends entirely on the problem; sometimes the problem will be a particular problem. Suppose we were working on the metallurgy of that particular thing, that would be assigned to an individual in the metallurgical department. If that happened to be a part of this, then it would have to be correlated to that, don't you see? But our job as managers is to develop the principles of correlation.

"Mr. Cox. Do you have any opinion, Mr. Kettering, as to whether the possibility of the acquisition of a patent plays any part in stimulating the men who work under your direction?

"Mr. Kettering. Oh, yes.

"Mr. Cox. You think it does?

"Mr. Kettering. The younger fellows, you know, the United States patent—*it is just like a diploma to those boys.* We like to see them get them.

"Mr. Cox. Well, patents in each case, however, are acquired by the company.

"Mr. Kettering. Sure. This fellow took it out, you see.

"Mr. Cox. He applies for it.

"Mr. Kettering. Yes.

"Mr. Cox. You have made a number of inventions, haven't you, Mr. Kettering?

"Mr. Kettering. Yes; quite a number.

"Mr. Cox. Have you ever acquired any patents on those personally?

"Mr. Kettering. I don't think I ever took out a personal patent. I may have one or two, but not that I could name offhand.

"Mr. Cox. *But patents were taken out on those inventions by the companies.*

"Mr. Kettering. *Whatever company I was with; yes. That is the way I like to do.*

"Mr. Cox. When you were making those inventions did the possibility of the acquisition of a patent serve to stimulate you in your work?

"Mr. Kettering. No; I wouldn't say it did; I would say it came more as a reward rather than as an incentive, because when

you are working on a problem, you see, I have had to give an order to get people to understand. They say, 'What is research?' Well, a research worker is a fellow who is working on something he doesn't understand—he is trying to solve a problem.

\* \* \* \* \* \*

"Mr. Cox. But is it your opinion that the patent as such nevertheless does serve to stimulate the work by inventors?

"Mr. Kettering. As I say, it comes to them, *especially these younger boys, as a reward of merit and it is very highly prized, and of course patents are very valuable things in many different ways.* It has been mentioned here that there are many different ways by which a patent can be valuable."[19]

■ The process which Mr. Kettering describes is the opposite of the individual invention rewarded by the patent law and the Constitution.[20] We are bound to take judicial notice that it is the normal process in great laboratories, not only because of Mr. Kettering's testimony, but also because, as has been shown, a research laboratory which controls the creative ability of all its employees can operate in no other way, either in justice to the stockholders or as a means of keeping up its organizational morale.

■ The burden of proof of patentability is on the applicant. Prior to the development of corporate research the circumstances under which the alleged invention was made were ordinarily not examined. The oath of the applicant was considered as a sufficient prima facie show-ing of invention provided the article itself was sufficiently novel. But today where the record shows that the real party in interest is a vast research organization possessing advantages not available to the outside scientist it would be contrary to modern experience to assume that the burden of proving the presence of inventive genius has been met without evidence disclosing the level of the art in that research organization at the time the application is made. This principle simply emphasizes the importance of individual achievement, which is the aim of the patent law.

This is not to say that an employee of a great research laboratory may not make an invention. It is only a recognition of the obvious fact that some further proof that he has made one, beyond the blueprints and specifications in the application, is required with respect to the products of those laboratories.

It is sometimes argued that the investments in research by dominant corporate groups should be protected by law in order to encourage them to spend more money for research and thus extend that domination. The reading of such a principle into the patent law should require an act of Congress. It should not be established by judicial legislation on the basis of a fiction that the collective effort of a corporate group is the work of an individual. Nor is the purpose of the Constitution served by a construction of law that gives to a dominating group the power to control the co-operative achievements of large groups of scientists.[21]

---

[19] Hearings, Temporary National Economic Committee, Investigation of Concentration of Economic Power, Part 2, pp. 341–343 (1939) ; 75th Cong., 3d Sess. (Emphasis added.)

[20] "To promote the Progress of Science and useful Arts, by securing \* \* \* *to* \* \* \* *Inventors* the exclusive Right to their \* \* \* Discoveries;" U. S. Constitution, Art. 1, § 8, cl. 8. (Emphasis added.)

[21] In his dissenting opinion in Williams Manufacturing Co. v. United Shoe Machinery Corp., 1942, 316 U.S. 364, 380, 62 S.Ct. 1179, 1187, 86 L.Ed. 1537, note 10, Mr. Justice Black cites an example of a common result of corporate patent policies:

"E. g., a 'Memorandum of Policy' from the files of an industrial corporation, set out in the TNEC Hearings, contains the following guidance for the corporation's patent division:

" 'Continuing the Monopoly by Us or Others

" 'It often happens that if minor improvements are protected by patents, machines and processes licensed under the original basic patents are given a much longer earning life by the fact that the minor improvements continue the protection on the machines, and even when the basic patents expire, others are prevented from using the latest commercial form of the machine.

" 'Example: The \* \* \* basic patents expired several years ago. Nobody, however, dare use the present type of \* \* \* machine because of improvements covered by minor patents. Likewise, if the original patent protection obtained on particular machines should not be sustained by the Courts, yet a second line of defense patents covering details and improvements may become a most valuable asset.

478

■ The well-known dominance of the Bell System over research in the entire communications field raises the question whether a patent should be granted, where the record shows it to be a product of that vast system of research, without a detailed showing of the present state of the art developed by its scientists and the extent, if any, to which some individual's contribution rose above the level of their common capacity. We are bound to interpret the patent law in the light of its purpose declared by the Supreme Court, to reward individual and not group achievement. Having that purpose in mind we cannot ignore the plain facts of the technological revolution which has occurred in the research laboratory.

■ In this case we have before us a complicated improvement in electrical communication made by an employee of and assigned to a research group that has long dominated and raised to a new level the application of science to communication. These circumstances, in the absence of evidence of individual achievement, create at least an inference that the machine is a step by step improvement, the result of skill and experimentation in the use of existing knowledge, and not an invention. That inference, which is not rebutted in the record, supports the findings of the court below that there is no invention in this case.

Judge EDGERTON concurs in this opinion.

Affirmed.

---

" 'It has always been our ambition to obtain patents which will be related to furnace, melting and refining, feeding, delivery, forming, automatic handling, carrying, stacking and annealing. Conceivably we might lose patent domination of one or more important links, but still retain practical control of the whole chain by means of controlling the most efficient form of the other links.' TNEC Hearings [Part 2], 777–778."