**PLANTRONICS, INC., Plaintiff,**

v.

**ROANWELL CORPORATION, Defendant.**

No. 72 Civ. 1625 (WCC).

United States District Court, S. D. New York.

Aug. 28, 1975.

Tom Arnold, Paul M. Janicke, and Arnold, White & Durkee, Houston, Tex., Brumbaugh, Graves, Donohue & Raymond, New York City, for plaintiff; Robert Neuner, New York City, of counsel.

Cooper, Dunham, Clark, Griffin & Moran, New York City, for defendant; Lester W. Clark, Charles W. Bradley, New York City, of counsel.

## OPINION

CONNER, District Judge:

This is an action for infringement of two utility patents and a design patent owned by plaintiff Plantronics, Inc. (Plantronics), relating to lightweight headsets (microphone and earphone assemblies) as used, for example, by airplane pilots and air traffic controllers. The action was tried without a jury, and this opinion comprises the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P.

### The Parties

Plantronics, formerly known as Pacific Plantronics, Inc., is a corporation of the State of California having its headquarters in Santa Clara, California. It is the successor of a partnership doing business as Plane Aids Company (Plane Aids). Its principal business is the manufacture and sale of headsets.

Defendant Roanwell Corporation is a corporation of the State of New York having its principal place of business in New York City. It is also in the business of manufacturing and selling headsets.

Jurisdiction and venue are not challenged.

Plaintiff is the owner of the three patents in suit, identified below.

## I. THE LARKIN PATENT

■ The Larkin U.S. patent 3,184,-556, issued May 18, 1965 on an application filed December 11, 1961, concerns a headset which utilizes a miniature microphone and a miniature receiver mounted within a small capsule which is supported near the wearer's ear, with a self-supporting, bendable, small-diameter, acoustic tube extending from the microphone to a point adjacent the wearer's mouth, and a flexible, small-diameter acoustic tube extending from the receiver and having at its outer end a plug inserted in the wearer's ear canal. In the illustrative headset disclosed in the patent, the capsule is provided with a spring clip which is adapted to be clipped onto the temple bar of a pair of eyeglasses or onto a headband. A small-diameter multi-conductor cable connects the microphone and receiver to external communications equipment. Only Claim 1 of the patent is in suit. It is set forth in full in the margin.[1] It is charged to be infringed by two of the Roanwell headsets, models R–70 and R–71.

Roanwell originally admitted the infringement of Claim 1 by both of these models, but shortly before trial with-

---

[1]. Claim 1 of the Larkin patent reads:
"1. A miniaturized microphone headset employing a miniature microphone and a miniature receiver, comprising the combination of support means for detachably supporting the miniature microphone and the miniature receiver adjacent the wearer's ear, a first acoustical tube, means for attaching one end of said first tube to said microphone and the other end of said first tube being adapted to be positioned adjacent to the wearer's mouth, a second acoustical tube, and means for attaching one end of said second tube to said receiver and the other end of said second tube being adapted to be plugged into the wearer's ear."

drew that admission and now contests the charge of infringement against both.

In addition to denying infringement, Roanwell asserts the following affirmative defenses against the Larkin patent: anticipation by and obviousness in view of the prior art, lack of inventorship, fraud on the Patent Office and indefiniteness of the asserted Claim 1.

## A. ANTICIPATION AND OBVIOUSNESS

In this, as in most patent infringement actions, the pivotal issue is whether the invention would have been obvious at the time it was made to a person having ordinary skill in the art, 35 U.S.C. § 103, a standard which Judge Learned Hand justifiably termed "perhaps the most baffling concept in the whole catalogue of judicial efforts to provide postulates for indefinitely varying occasions." Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 536 (2d Cir. 1955).

Viewed retrospectively, the Larkin invention would seem an obvious combination of old elements. But so would virtually every other invention which consists of a combination of mechanical and/or electrical components. Thus we have been admonished by Graham v. John Deere Co., 383 U.S. 1, 36, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), to avoid " 'slipping into use of hindsight' " and to "resist the temptation to read into the prior art the teachings of the invention in issue" by determining the issue of obviousness under § 103 in accordance with the following uniform procedure:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be acertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy." Id. at 17–18, 86 S.Ct. at 694.

The "secondary considerations" referred to were apparently inspired by the repeated statements of Judge Learned Hand, for example in his oft-quoted opinion in Reiner v. I. Leon Co., 285 F.2d 501, 503–04 (2d Cir. 1960), cert. denied, 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388, reh. denied, 366 U.S. 978, 81 S.Ct. 1918, 6 L.Ed.2d 1268 (1961):

"The test laid down is indeed misty enough. It directs us to surmise what was the range of ingenuity of a person 'having ordinary skill' in an 'art' with which we are totally unfamiliar; and we do not see how such a standard can be applied at all except by recourse to the earlier work in the art, and to the general history of the means available at the time. To judge on our own that this or that new assemblage of old factors was, or was not, 'obvious' is to substitute our ignorance for the acquaintance with the subject of those who were familiar with it. There are indeed some sign posts: e. g. how long did the need exist; how many tried to find the way; how long did the surrounding and accessory arts disclose the means; how immediately was the invention recognized as an answer by those who used the new variant?"

See also Safety Car Heating & Lighting Co. v. General Electric Co., 155 F.2d 937, 939 (2d Cir. 1946), and cases cited therein.

In most validity contests, it is these "signposts" which furnish the only objective guidance and which ultimately prove dispositive. However, we must begin with the preliminary determinations directed by Graham.

### Scope and content of the prior art

The principal prior patents and publications relied on by Roanwell in attack-

ing the validity of Larkin are the following:

*British Pritchett patent 191 (1878)*

This patent, issued at the dawn of the age of telephony, shows several different types of microphone and receiver combinations designed to leave the hands free for writing and other functions, the version most relevant here being that of Figure 5. That device includes a single transducer for both transmitting and receiving, contained in a rather large and cumbersome horn-shaped housing resembling an inverted receiver from an old pedestal-type telephone which is adapted to be suspended from a clip on the wearer's lapel. A rigid tubular column projects from the large upper end of the housing to a point opposite the wearer's ear and a rigid horizontal tubular extension at its upper end projects into the ear canal. A smaller diameter voice tube projects forwardly and upwardly from the housing, and a small horn at its outer end is positioned in front of the wearer's mouth.

There is no evidence that this device, implausibly designed by an architect, was ever constructed, much less marketed, and there is considerable doubt as to its practicability. Movements of the wearer's head, if they were permitted at all by the spike-like column impaling the wearer's ear, would vary the distance from the mouth to the voice tube and accordingly the amplitude of the transmitted signal.

*Olney et al. U.S. patent 2,485,405 (1949)*

Olney, which was cited and considered by the Patent Office during prosecution of the Larkin application, shows a headset consisting of a single "platform" type earpiece which lies flat on the auricle or external ear and is supported by a resilient metal headband extending over the top of the wearer's head, and which contains both the receiver and the microphone, with a dual acoustic tube cantilevered from the earpiece and extending to a point adjacent the wearer's mouth. The two voice tubes are respectively connected to opposite sides of a dual-chambered input housing, and to opposite sides of the microphone diaphragm, so that "noise" or extraneous sound waves from remote sources which are substantially equidistant from the inlet orifices at opposite ends of the input housing impose substantially equal and opposite pressures on the diaphragm and are thus effectively cancelled out. This noise-cancelling dual voice tube arrangement is described as optional and replaceable by a single voice tube.

As far as the record shows, the Olney device was never commercialized.

*The Western Electric WE 52 headset*

The WE 52, which was standard equipment for telephone operators in the Bell System during the 1950's, is similar in configuration to the Olney headset, having a single platform earpiece supported by a headband, with a microphone supported in front of the wearer's mouth by a boom cantilevered from the earpiece.

In practice, this headset proved uncomfortable when worn for long periods and also unstable, as rapid head movements tended to cause the platform earpiece to slide on the ear, with resulting displacement of the microphone relative to the mouth.

*Dreher et al. U.S. patent 2,904,640 (1959)*

Dreher, also a file wrapper reference against Larkin, discloses a headset having a molded plastic body shaped to fit into the concha of the ear with an integral, tubular extension projecting into the ear canal. The body supports a single transducer used for both transmitting and receiving under control of a remote push-to-talk switch. A rigid, bendable voice tube cantilevered from the body has at its outer end an intake cup positioned in front of the wearer's mouth.

This device, which was not widely used, if it was marketed at all, has the disadvantage that the earmold insert must be shaped and sized to fit the individual wearer and must always be worn on the same side of the head. The stability of the headset is also highly questionable.

*The Telex headset (1959)*

This headset incorporates the widely uesd Telex "Twinset," a receive-only headset shown in the Gilbert U.S. patent 2,586,644 issued in 1959, which had a resilient metal headband with a small plastic housing at each end adapted to lie against the side of the head adjacent one of the ears and containing a small receiver. A rigid, curved ear tube was rotatably mounted on each housing to permit adjustment of the portion of its outer end, which was provided with a plug to fit into the ear canal. A Telex flyer published in 1959 shows a modification of this device having a microphone boom cantilevered from one of the housings with a microphone at its outer end adjacent the mouth. The mass of the microphone at the outer end of the boom, with its substantial moment arm, created a problem of stability.

*The Spencer-Roberton article (1960)*

This article in a technical publication shows the headset which at that time was standard equipment for telephone operators in Great Britain. Like the Olney headset, it includes a single headband-supported platform earpiece containing a microphone witth a cantilevered, bendable, segmented input horn, mounted for rotation about the axis of its small end to permit proper positioning of its enlarged input end in front of the wearer's mouth.

*Henderson U.S. patent 2,939,923 (1960)*

Henderson discloses hearing aid earpieces of several configurations, the most relevant probably being that of Figures 4 and 5, which has a small cylindrical housing containing a receiver which is supported from a flexible acoustic tube which extends over the top of the ear and terminates in a plug adapted to fit into the ear canal, the tube extending through an optional molded insert shaped to fit the concha of the ear for enhanced stability. A lightweight cord connects the earpiece to an external housing containing an amplifier and a microphone which, for example, may be carried in the pocket of the wearer's shirt or jacket.

*Guttner et al. U.S. patent 3,209,080 (filed 1961)*

Guttner discloses a self-contained hearing aid of the "post-auricular" type having a curved housing adapted to. fit behind the external ear, with a hook-like extension at one end adapted to engage the upper front edge of the auricle. The housing contains a microphone, amplifier and receiver, with the latter communicating with a flexible acoustic tube which extends from the end of the hook-like extension and terminates in a plug fitting into the ear canal. Incoming sound waves reach the microphone through a short passageway of small diameter which opens at the front side of the hook-like extension.

*The differences between the claimed invention and the prior art*

All of the individual elements of the combination recited in Claim 1 are shown by the prior art. However, no single item of prior art shows the complete combination.

Roanwell contends that Pritchett (Figure 5) and Dreher each fully anticipates Claim 1. Neither does so.

In Pritchett, there is not a *"miniature* microphone *and* a *miniature"* receiver as called for in Claim 1, but a single large and ungainly transducer. Nor is there "support means for detachably supporting the miniature microphone and miniature receiver adjacent to the wearer's ear," as further called for. In Figure 5 of Pritchett, the transducer housing is suspended against the wearer's chest.

Dreher likewise has only a single miniature transducer for both transmission and reception. Dreher further lacks "support means for detachably supporting the miniature microphone and the miniature receiver *adjacent to* the wearer's ear," and "a second acoustical tube, and means for attaching one end of said second tube to said receiver and the other end of said second tube being adapted to be plugged into the wearer's ear," in the sense intended by Claim 1. In Dreher, the earmold housing supports the trans-

ducer not *adjacent to* the auricle, but *in* it. Moreover, to read Claim 1 on Dreher would require a multiple inclusion: the one-piece earmold insert would have to be, at one and the same time, 1) the "support means," 2) the "second acoustical tube," and 3) the "means for attaching one end of said second tube to said receiver." Finally, the portion of the claim that reads "the *other end* of said second tube being adapted to be plugged into the wearer's ear" suggests that the ear receives only the end of a tube which extends for some distance outside; in Dreher, the *entire* tubular extension projects into the ear canal.

However, I do not agree with Plantronics' further argument that Dreher's tubular extension is too short to be an "acoustical tube" because that expression is applicable only to tubes of sufficient length (e.g., 1½ inches) to exhibit resonance peaks and nulls in the audio frequency range. I find no basis, in the specification or elsewhere, for reading any such limitation into Claim 1, and I therefore interpret the term "acoustical tube" as encompassing any tube which carries sound waves.

Nevertheless, I conclude that Claim 1 is not anticipated by any single item of prior art.

With the always perfect guidance of hindsight, it is easy now to see how the claimed combination could be assembled by properly selecting individual elements or even groups of elements from the various prior art devices. For example, Guttner disclosed a housing containing a miniature microphone and miniature receiver, with the latter communicating with a flexible acoustic tube terminating in an ear plug. Olney taught an acoustic tube extending from a point near the wearer's mouth to a microphone in the same housing that contains the receiver. Adding Olney's voice tube to Guttner's device, and modifying Guttner's electrical circuit, as also taught by Olney, so that the microphone and the receiver, instead of being connected to one another through an amplifier, are connected to separate external transmitting and receiving circuits, would produce the complete combination recited in Claim 1 of Larkin.

This assumes, of course, that the claim is interpreted, as Plantronics contends it should be (and as it must be for it to be infringed by the accused Roanwell headsets), so that the "support means" covers a post-auricular housing hooking over the ear and not merely the eyeglass clip-on capsule illustratively shown.

However, no such combination of the elements of Guttner and Olney was suggested by either. Since there are rarely any new elements, virtually any combination of elements ever claimed could be thus pieced together by properly selecting individual elements from the infinite parts bin of the prior art. As Judge Learned Hand repeatedly observed, for example, in *Safety Car Heating & Lighting Co. v. General Electric Co., supra* at 939:

"Substantially all inventions are for the combination of old elements; what counts is the selection, out of all their possible permutations, of that new combination which will be serviceable. No objective standard is practicable; (*Kirsch Manufacturing Co. v. Gould-Mersereau Co.*, 2 Cir., 6 F.2d 793; *Potts v. Coe*, 78 U.S.App.D.C. 297, 140 F.2d 470; as, for example, whether each of the elements operates in a different way from what it did in other combinations. That is almost never true of a machine; each member ordinarily performs the same mechanical function which it does in any other machine; it is their cooperation that produces the result, and the value of that cooperation depends upon the sagacity which divined the end and fabricated the means."

See also *B. G. Corp. v. Walter Kidde & Co.*, 79 F.2d 20 (2d Cir. 1935); *Kirsch Mfg. Co. v. Gould Mersereau Co.*, 6 F.2d 793, 794 (2d Cir. 1925). Judge Medina made a more recent statement to the same effect in *Ling-Temco-Vought, Inc.*

*v. Kollsman Instrument Corp.*, 372 F.2d 263, 268 (2d Cir. 1967).

Thus, as virtually always, we must ultimately resort to a review of the history of the art before and after the invention. Incidentally, such a review, in combination with the prescribed prefatory analysis of the prior patents and publications, is also usually the best, and frequently the only, way to determine "the level of ordinary skill in the art" as further directed by *Graham*.

### The history of the art
### The Air Force Panel

In 1956, the United States Air Force found all the headsets then available so unsatisfactory that it initiated a survey which involved convening a Panel of Experts to canvass all the possible alternatives.

The 1959 report of that Air Force project reads in part:

"Objective of the Program

"The basic purpose of the program was to discover and explore improved means for voice communication during Air Force operations. * * * Improvements are desired which will:

"(a) decrease the size, weight and discomfort associated with the equipment which must be worn on or about the head of the flier; * * *

"The discomfort of flying headgear is to a large degree attributable to the interphone equipment. * * * The degree of discomfort which we are concerned with here is in the category of *intolerable*. Specifically, the complaint has been called *ear torture*. It is reported as being of such degree as to detract from the operational effectiveness of flying personnel on long range bombing missions. If a man is supposed to wear his helmet for the duration of a flight, but cannot because of intolerable pain, and without it he is not only inadequately protected, but cannot be adequately supplied with oxygen, and is inadequately prepared for emergency flight conditions, then the condition is an operational hazard.

Hence, elimination of discomfort has been an *urgent necessity.*" (Emphasis added)

\* \* \* \* \* \*

"The first step in the program was to assemble a team, including some of the most competent experts in the field from all over the country. The program has been guided by a Panel of Experts consisting of ten individuals or groups having great experience in all aspects of the problem: electroacoustic transducer design * * *."

This Panel of Experts prepared a list of all the known types of transducers, means for coupling them to the audio source and to the ear, and means for excluding unwanted signals or "noise." It recommended for further investigation several types of microphones and coupling systems, none of which was used in the Larkin headset. It produced no solution to the recognized problem of "ear torture."

### United Air Lines

In 1960, United Air Lines was using a headset designated HS–33, which was a receive-only unit of the "circumaural" type, with each of the two receivers supported at the center of an "earmuff" or padded ring surrounding one of the external ears, so that the pressure was applied against the adjacent portions of the head rather than the ear itself, and with the two muffs connected by a resilient metal band extending over the top of the head. A separate hand-held microphone was used for transmission. In a memo of June 30, 1960, United's Engineering Vice President, Mentzer, described the HS–33 headset model as "large, cumbersome, and uncomfortable to wear," and the hand-held microphone as "relatively large, heavy, elusive and awkward."

United had experimented with Western Electric's WE 52 headset, which weighed about half a pound, and consisted of a single "platform" type earpiece which contained the receiver and which was supported by a resilient metal headband. The microphone was supported in front of the wearer's mouth, on an adjustable

metal boom cantilevered from the earpiece.

United found both the WE 52 headset, and a similar Telex headset, which it also tested, unstable; if the wearer moved his head quickly, they would tend to slide out of position or even fall off.

The Mentzer memo of June 1960 included a photograph of a typical eyeglasses-contained hearing aid of the type then commercially available, having the amplifier housed in an enlarged temple bar and a flexible acoustic tube plugged into the wearer's ear canal.

The Mentzer memo suggested a similar approach to the problem of a lightweight headset, and included another photo of a mockup in which conventional eyeglass frames were used to support a round button-type hearing aid receiver in the concha of the ear, with a tubular extension projecting into the ear canal, and with a microphone suspended in front of the mouth by wires connected to opposite sides of the eyeglass frames. This suggestion was never developed beyond this inoperative mockup. Believing it to be "too far off for our urgent need," Mentzer's superior, J. M. Hodgson, in August 1960 ordered United's San Francisco engineering group to "review the market to determine what is available in the headphone/boom mike field," and to procure samples for evaluation. This task was assigned to two United engineers: Austin F. Trumbull, who was Superintendent of Electronic Engineering, and one of his engineers, Merlin Leonhardt.

Leonhardt proceeded to contact some 20 to 25 U.S. and foreign vendors in the headset field, including Roanwell, requesting information on available lightweight headsets, with transistorized amplifiers and dynamic microphones. Nineteen companies replied. Twelve of the nineteen said they could not meet United's requirements; the remaining seven, including Roanwell, sent brochures or submitted sample units. None was found satisfactory by United.

One of the samples submitted was from Airmed, Ltd., of Great Britain.

The Airmed unit weighed about a pound, had two circumaural muffs connected by a metal headband, and a boom microphone mounted in front of the mouth. United evaluated this headset as a good boom-microphone headset for the state of the art at that time, but still too clumsy, and unacceptable for United's needs.

A brochure submitted by Amplivox showed a headset called "Amplilite," which was similar to the Airmed. Because of this similarity, a sample was not requested. It was judged also unsatisfactory because of its clumsiness—even though it was being promoted by its manufacturer as combining lightweight wearing comfort with a robust construction.

Carter Engineering submitted a headset sample, also employing two ear muffs, headband and boom mike suspended in front of the mouth. United found this unit to be "very cheaply constructed" and "quite uncomfortable after one hour of wearing," and similarly rejected it.

Roanwell submitted a brochure, but it did not disclose any new lightweight assemblies. Telephonics promised to submit a sample, but never did.

Telex submitted a prototype which was a modification of its Twinset with a boom microphone mounted in front of the mouth, similar to the combination shown in the aforementioned Telex flyer.

United evaluated the Telex unit, and found that, although it was relatively light (a quarter to a half pound), it was still "not what we were looking for." The substantial mass of the microphone, cantilevered in front of the mouth, some distance from the point of support, caused it to be unstable; its movement away from the mouth reduced the output of the transmissions.

United thus found no suitable lightweight headset through this search.

During 1960–61, Plane Aids sold under the name "Sun & Fun" a transistor radio mounted in an enlarged temple bar of a pair of sunglasses, with a flexi-

ble acoustic ear tube extending from the temple bar and having at its outer end a plug fitting into the wearer's ear canal. Upon seeing a promotional flyer for this unit, Trumbull of United, over the signature of Mentzer, wrote to Plane Aids, advising that United was interested in some of the techniques involved in the radio sunglasses, but for a different application. After an initial meeting between the patentee, W. Keith Larkin, then president of Plane Aids, and Trumbull and Leonhardt of United, in which Trumbull explained United's needs, Plane Aids commenced a project for development of a headset to satisfy those needs.

This project resulted in the Plantronics headset, identified as MS–50, a commercial adaptation of the headset described and claimed in the Larkin patent in suit, which was tested by United and adopted as standard for all of its aircraft. This unit, which has previously been described, weighed about one ounce, was comfortable and compact, could be worn on either side of the head, had good audio characteristics, and permitted intra-cockpit conversations.

Pan American and a number of other airlines subsequently followed United's lead and likewise standardized on the MS–50.

*Federal Aviation Administration (FAA)*

An official FAA report entitled "Development of Lightweight Headset," dated February 1963, described the long-existing need for such a satisfactory headset as follows:

"For many years the Agency has sought an improved headset which could be worn by controllers for long periods of time without discomfort and yet provide adequate transmission and reception capabilities. The headsets normally issued have been described by the controllers as bulky, heavy, uncomfortable, and cumbersome. They have been known to produce headaches and sore ears after continuous wear, and have caused in-

terference with normal activities such as eating and smoking."

In attempting to overcome these problems, the FAA had organized an in-house development effort, described in the report as follows:

"Numerous attempts have been made to provide improved headsets both by requests to the telephone companies and by investigation of commercially available items for possible use by air traffic controllers.

"Several commercially available items have appeared promising and have been privately purchased and tried with some favor. Foremost of these were the Telex headsets and various hearing aid receivers which employed earpieces to fit inside the ear, thereby eliminating the earcups and pads which were a major cause of discomfort. Minor modifications were made to the currently used Western Electric Type 52 headset from time to time, but there were no major improvements.

"A number of the most promising commercially available items were purchased and sent to the National Aviation Facilities Experimental Center for tests of their acoustical characteristics. The plan was to determine the most suitable transducer elements for transmitting and receiving and to develop an improved headset using these elements as a basis."

This search ended when the FAA saw the Plantronics MS–50. As stated in the official report:

"In September, 1961, representatives from Plantronics, Incorporated, came in with an idea and a proposal. The headset which they proposed to develop appeared so ideally suited for air traffic control use that the previously planned in-house development effort was discontinued."

A comparative evaluation of the best available headsets was conducted by the FAA, involving forty air traffic controllers with "a cross-selection of dif-

ferent usage, head shapes and sizes, ages, and environment." The test was among the Plantronics MS–50, a new headset supplied by Bell Telephone Laboratories, called the Y–1, and the then-standard WE 52. The Y–1 was essentially a lighter version of the WE 52, in which the WE 52's front-mounted boom microphone was replaced by an exponential horn extending from a microphone mounted on an earphone of the same configuration as that used in the WE 52. The Y–1 was thus similar to the standard British telephone headset, as disclosed in the Spencer-Roberton 1960 article.

After several weeks' use of each of the headsets, 77% of the controllers expressed a preference for the MS–50, with 89% rating it the most comfortable. Additionally, and somewhat surprisingly in view of the miniature transducer used in the MS–50, the controllers found the MS–50 to be more satisfactory in the respect of audio characteristics than either the Y–1 or the WE 52. The FAA accordingly standardized on the MS–50 for air controller use.

*National Aeronautics and Space Administration (NASA)*

According to Mr. George Metcalfe, a NASA Communications Specialist responsible for the issuance and maintenance of headsets at Cape Canaveral and later at the Manned Spacecraft Center in Houston, in the use of all the headsets known and available in 1961, including the WE 52 then standard for NASA ground controllers, "[t]he fatigue problem was a major complaint."

After becoming aware of the Plantronics MS–50, despite initial opposition to it by Metcalfe, virtually all the NASA ground controllers adopted it. Metcalfe also was ultimately won over, referring to the MS–50 as

"an excellent headset. * * * * [L]ightweight. You can wear it for eight hours without caving in. And it has been a fantastic improvement over the WECO 52 headset."

The MS–50 was accordingly adopted as standard equipment at NASA.

*Market impact*

The Plantronics MS–50 has enjoyed substantial commercial success. Over 700,000 units have been sold. Even after the introduction of Plantronics' later model "StarSet" (a post-auricular headset which is the subject of the Hutchings utility patent, and is also claimed to come within Claim 1 of the Larkin patent), many users continued to buy the eyeglass-mounted MS–50 in preference to it.

The MS–50 was the first headset designed by an outside manufacturer to be approved for use in the Bell Telephone system. This experience caused Bell, which had long opposed the use of miniature transducers, to accept and even favor them.

Other headset manufacturers also became converts. Amplivox, which had submitted an unacceptably heavy headset to United Aircraft, produced a new headset called the "Minilite" which was similar to Larkin's. Electro-Voice later submitted to United Aircraft a similar model.

*Roanwell*

In 1962, Roanwell obtained and evaluated an early commercial unit of the MS–50 headset. Its reaction was favorable to the point of envy. Roanwell's engineers stated:

"It seems that Plantronics has come up with a combination of user comfort, low weight, high versatility, and adequate voice transmission which has gained them appreciable acceptance (Project Mercury) in a relatively short time."

And Roanwell's management expressed agreement with their engineers' conclusion that the Plantronics headset, "may be the basis of a new generation of headsets." It accordingly authorized a project to produce a similar headset. As one of their engineers on the project, Mr. Foley stated:

"It was essentially a copy of the MS–50 from Plantronics, one of their models with some slight changes to make it look slightly different."

This Roanwell project continued for a year or more; tooling was acquired and a parts inventory purchased. For reasons unexplained by Roanwell, the project was abruptly terminated around December 1965, before commercial production had begun.

The reason apparently lay in the fact that the Larkin patent had issued in May of 1965. Six weeks later, in July 1965, an attorney for Plantronics wrote to Roanwell indicating that Plantronics had been informed that Roanwell was designing a copy of the Plantronics headset on the assumption that it was not protected by a patent, and supplying a copy of the issued Larkin patent with an admonition that any infringement of it would result in appropriate legal action.

## SUMMARY

All of the "signposts" thus appear to point in the direction of non-obviousness.

The record establishes that there was a long-recognized need for a lighter, more comfortable headset to eliminate the fatigue and pain, rather extravagantly termed "ear torture," involved in the wearing of all previously known headsets over extended periods. A number of organizations with access to the best minds in the field, including the airlines, the U.S. Air Force and FAA, as well as the industry suppliers whom they consulted, had been actively searching over a number of years for an answer to the problem, but had found none, despite the availability of all the components ultimately employed by Larkin. When Larkin's headset was publicly disclosed, it received almost immediate recognition as an elegant and ingenious solution. It enjoyed impressive commercial success. It revolutionized thinking in the headset industry, overcoming ingrained prejudices, and its concepts have been widely copied by competitors, one of whom aptly termed it the progenitor of a "new generation of headsets."

These same factors have been characterized by Judge Learned Hand as the strongest possible proof of patentable invention. In *Lyon v. Bausch & Lomb Optical Co.*, 224 F.2d 530, 535 (2d Cir. 1955), he stated:

"The most competent workers in the field had for at least ten years been seeking a hardy, tenacious coating to prevent reflection; there had been a number of attempts, none satisfactory; meanwhile nothing in the implementary arts had been lacking to put the advance into operation; when it appeared, it supplanted the existing practice and occupied substantially the whole field. We do not see how any combination of evidence could more completely demonstrate that, simple as it was, the change had not been "obvious * * * to a person having ordinary skill in the art"— § 103.

Indeed, as simple as the invention now appears, it would seem presumptuous to the point of arrogance to conclude that it was "obvious" to persons of ordinary skill in the art, notwithstanding their lengthy and unsuccessful struggle to achieve such results. As I recently wrote for the Court of Appeals in *Timely Products Corp. v. Stanley Arron*, 523 F.2d 288 (2d Cir. 1975):

"We can conceive of no better way to determine whether an invention would have been obvious to persons of ordinary skill in the art at the time than to see what such persons actually did or failed to do when they were confronted with the problem in the course of their work. If the evidence shows that a number of skilled technicians actually attempted, over a substantial period, to solve the specific problem which the invention overcame and failed to do so, notwithstanding the availability of all the necessary materials, it is difficult to see how a court could conclude that the invention was obvious to such persons at the time."

I accordingly conclude that the invention defined by Claim 1 of the Lark-

in patent is not invalid on the ground of obviousness under 35 U.S.C. § 103.

## B. INVENTORSHIP

Roanwell contends that the Larkin patent is invalid on the further ground that the claimed invention was conceived not by Larkin but by William Bowman, an electronics technician who was employed by Plane-Aids in 1961, shortly before the first prototype was submitted to United Airlines.

This contention is based entirely upon Bowman's uncorroborated deposition testimony that at the time he was hired by Plane-Aids, Larkin had been working on a balsa wood mockup shaped like Plane-Aids' "Sun & Fun" radio sunglasses with a boom microphone added, and that, upon being asked to evaluate it, he told Larkin that it offered nothing new and that he would like to explore some ideas of his own. Thereafter, according to Bowman, he tested a voice tube extending from a miniature microphone mounted on the temple bar, in place of the boom microphone, and when he showed it to Larkin and to Graham, a United Airlines pilot who was Plane-Aids' chief executive officer, they were surprised that it worked; and the balsa wood mockup was accordingly abandoned in favor of a pair of Dahlberg hearing aid eyeglasses having attached to the large temple bar a microphone with a voice tube extending from it.

This testimony was flatly contradicted by Larkin, who said that he suggested the voice tube to Bowman who was initially dubious of its operability because such tubes were known to exaggerate bass tones. Larkin says that, although his knowledge of acoustical tubes was "zero," he envisioned that this bass accentuation might tend to "offset the tinniness we were encountering" in the audio output of the miniature microphone, an assumption which was later proved correct.

Larkin's testimony was corroborated by a notarized invention disclosure document which he prepared and executed

on July 7, 1961, and by the deposition testimony of a Mr. Burnell, who was one of the three or four full-time employees the company then had, and who is now unconnected with Plantronics and is thus a disinterested witness.

There is a *prima facie* presumption that the claimed invention was conceived by the named patentee, a presumption which has been said to be rebuttable only by evidence which is "clear, strong and convincing." *Cummings v. Moore*, 202 F.2d 145, 148 (10th Cir. 1953). Plantronics argues that *Coffin v. Ogden*, 85 U.S. (18 Wall.) 120, 21 L. Ed. 821, 823 (1874), would require proof "beyond a reasonable doubt," but I need not decide whether that standard is applicable here, since Roanwell has failed to establish Bowman's alleged origination of the invention by even a simple preponderance of the evidence.

Roanwell also argues that it was Bowman who suggested mounting the microphone and receiver in a capsule which clips onto the frame of the eyeglasses. Roanwell has failed to establish even this much, but it would be of no consequence if it had, because Claim 1, the only claim of Larkin in suit, does not recite the clip-on capsule.

## C. FRAUD ON THE PATENT OFFICE

Roanwell further contends that the Larkin patent is invalid on the ground of fraud in the prosecution of application for the Larkin patent, in that the original claims covered a miniature headset with an acoustical voice tube, without mentioning the ear tube and, after the claims were rejected on the basis of the Dreher patent disclosed above, they were amended by adding the recitation of a second acoustical tube extending into the ear, with the "Remarks" accompanying the amendment asserting that Dreher "only has one tube." Roanwell argues that Larkin and his attorneys not only knew that Dreher also had an ear tube, but they also knew of many other devices that had ear tubes, including Plane-

Aids' own "Sun & Fun" radio sunglasses and the Dahlberg hearing aid eyeglasses, both of which Larkin had used in constructing early prototypes of his headset.

Insofar as Dreher's disclosure is concerned, the Patent Office examiner had the patent itself before him, and knew just as well as Larkin what it disclosed. In arguing that Dreher has only one tube, Larkin's attorneys clearly meant only that Dreher did not have an ear tube in the sense intended by Claim 1.

When the language of Claim 1 is interpreted in the context of the complete claim and in the light of the specification, as it must be, the "second acoustical tube" is seen to refer to a flexible tube which extends from a receiver on a support means located adjacent to (but not *in*) the external ear and which has at its outer end a plug fitting into the ear canal. In arguing that Dreher has only one tube, Larkin's attorney obviously meant that Dreher has no ear tube *of this type*. He surely did not mean, as Roanwell implies, that Dreher has no ear tube *at all*, because the examiner was obviously aware that Dreher's earmold insert has an integral tubular extension which projects into the ear canal.

Nor was there any apparent deceptive design in Larkin's failure to disclose to the Patent Office the use, in prior devices, of flexible ear tubes plugging into the ear canal. The same examining division which handled the Larkin application was also responsible for examining applications on hearing aids. And it was a matter of common knowledge in the art that post-auricular hearing aids had been provided with such ear tubes. Larkin was surely not trying to conceal such a well-known fact. Nor was there any reason for him to do so. He was not claiming any novelty in ear tubes *per se*, but only in the complete combination which included a support means adjacent the ear supporting a miniature microphone and a miniature receiver with voice and ear tubes extending respectively from them.

Roanwell has thus failed to establish any material misrepresentation or concealment by Larkin, much less the required intent to deceive or reckless disregard of the duty of candor. *Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 969 (S.D.N.Y.1971).

### D. INFRINGEMENT

After initially conceding that both its R–70 and R–71 headsets infringe Claim 1 if it is valid, Roanwell now contends that the portion of the claim that calls for "support means for detachably supporting the miniature microphone and the miniature receiver adjacent to the wearer's ear" is not applicable to the post-auricular housing hooking over the auricle which is employed in both the R–70 and the R–71.

Roanwell argues that in their headsets, the microphone and receiver are not supported "*adjacent to* the wearer's ear" but *on* it. The short answer is that *both* conditions are met—the transducers are supported *adjacent* to the ear, in the sense of proximity, and are supported *on* the ear in the sense that their weight is carried by the ear. Thus I encounter no difficulty in concluding that the language of Claim 1 is literally readable in its entirety, on both the R–70 and R–71.

However, that is not the end of the matter. The last sentence of 35 U.S.C. § 112 provides that

"An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

The question thus remains whether the ear-hook arrangement of the Roanwell headsets is an "equivalent" of the eyeglass-clip supporting means disclosed in the Larkin patent. I find that it is. In both structures, the housing is supported on the side of the head adjacent to (but not in) the ear, with its weight

supported, at least in part, on the top of the ear, eliminating the clamp-type headbands and the inward pressure they imposed either on the ears themselves or on the sides of the head adjacent the ears, which had characterized virtually all the commercially available headsets prior to Larkin.

I therefore conclude that Claim 1 is infringed by both the R–70 and the R–71.

### E. DEFINITENESS

Roanwell's entire argument with respect to the alleged indefiniteness of Claim 1 consists of a single sentence to the effect that if the claim is interpreted to cover any support means other than the eyeglass frame clip-on structure illustratively disclosed, it would lack the precision required by 35 U.S.C. § 112. That argument is not persuasive. Its uniform adoption would render "means" claims useless and effectively repeal the last sentence of Section 112, a result I cannot accomplish judicially and would not if I could. As the courts have repeatedly observed, no patent would be worth much if its coverage were limited to the precise structure shown in the drawings. Indeed, the doctrine of equivalents was judicially created to protect inventors by broadening the coverage of their patent claims beyond their literal language to encompass structures achieving the same result by similar means. Surely such protection should not be denied one whose claims require no such broadening but are squarely readable on the accused devices.

I conclude that Claim 1 has the definiteness required by Section 112.

### II. THE HUTCHINGS UTILITY PATENT

The Hutchings patent U.S. 3,548,118 (the Hutchings utility patent), issued December 15, 1970 on an application filed July 3, 1969, involves a "post-auricular" (behind the external ear) headset which includes a housing curved to fit the contour of the rear surface of the auricle and having at its upper end a hook-shaped projection which engages the upper front edge of the auricle to support the housing against the ear. The housing likewise contains a miniature microphone and receiver. A voice tube extends from the forward end of the portion of the housing which projects above the ear, obliquely downwardly and forwardly to a point adjacent the wearer's mouth, and a flexible, small-diameter ear tube extends from the lower end of the housing, underneath the ear and is provided at its outer end with a plug which fits into the ear canal. The voice tube has telescoping sections to permit adjustment of its length, and its inner end is supported in a ball and socket connection to permit lateral movement of its free or input end for proper positioning relative to the wearer's mouth. Plantronics designated Claim 1 of this patent as typical, and stipulated that the validity of all of the other claims would depend on that of Claim 1; it is set forth in full in the margin.[2] It is charged to be infringed only by the Roanwell R–70.

Roanwell admits that Claim 1, if valid, is infringed by the R–70. As affirmative defenses against the patent and in support of its counterclaim of invalidity, Roanwell asserts obviousness in view of the prior art, fraud on the Patent Office,

---

2. Claim 1 of the Hutchings utility patent reads:

"1. A headset comprising a housing adapted to be placed behind the ear of a user, said housing including an integral upper curved extension adapted to extend over and engage the top of the ear, a microphone disposed in and near the top of said housing, a forwardly extending voice tube communicating with said microphone and posi-

tionably secured to the upper extension of said housing, said voice tube being adapted to have its distal end positioned adjacent the user's mouth, a receiver disposed in and near the bottom of said housing, and a flexible tube secured to the bottom of the housing and adapted to provide communication to the auditory canal of the user's ear."

and double patenting in view of the design patent.

## A. OBVIOUSNESS

### Scope and content of the prior art

■ In its attack on the Hutchings utility patent, Roanwell relies upon the following principal items of prior art in addition, of course, to the Larkin patent:

### The Plantronics MS–43 (1962)

In 1961, even before the MS–50 was placed on the market, Plantronics began work on a post-auricular headset having the microphone and receiver contained in a small capsule curved to fit the rear side of the auricle, with an ear tube extending out of its upper end, over the top of the auricle and terminating in a plug fitting into the ear canal, and a voice tube extending from its lower end under the ear and generally horizontally to a point adjacent the corner of the mouth. The first prototype, which was fabricated at Audiotone in Phoenix, Arizona, in the spring of 1962, was produced by modifying an Audiotone Model 77 post-auricular hearing aid. Several units were built and, although none was sold, they were given away and admittedly went into public use in 1962. Thus the unit is part of the prior art from which the alleged advance of the Hutchings patent must be measured. See *Application of Foster*, 343 F.2d 980, 52 CCPA 1808 (1965), *cert. denied*, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307, *reh. denied*, 384 U.S. 934, 86 S.Ct. 1441, 16 L.Ed.2d 535 (1966).

### German provisional patent (DAS) 1,132,-973 (1962)

This German patent discloses a post-auricular hearing aid in which the microphone input is through a tube which extends from the top of the capsule, hooks over the top of the auricle and terminates at a point near the center or focus of the auricle, while the ear tube extends from the lower end of the capsule, curves beneath the ear lobe and terminates in a plug fitting into the ear canal.

### Flygstad et al. U.S. patent 3,280,273 (1966)

The Flygstad patent, based on a 1963 application assigned to Telex, discloses a post-auricular headset developed at Telex which was substantially identical to the MS–43. Like the MS–43, it was apparently never marketed.

### The Oticon hearing aid (1968)

The Oticon device, as illustrated in a 1968 publication, is similar to that shown in the above German patent, except that both the voice tube and the ear tube project from the top of the capsule. This device was widely marketed, and Plantronics acquired one in its development of Hutchings' post-auricular headset.

### The Bell System Model 61 headset (1965)

The Model 61 was the end result of a development program begun at Bell Telephone Laboratories in 1963. It became the subject of the Bryant et al. U.S. patent 3,440,365 which Bell Laboratories obtained in 1969 on an application filed in 1965. It had a capsule containing a miniature microphone and receiver removably attached to an interchangeable earmold insert fitting the concha of the ear and having an integral tubular extension fitting into the ear canal and communicating through a passage in the insert with the receiver.

This device was used as standard equipment by operators in the Bell System during the late 1960's. In December 1968, after soliciting quotations from a number of independent suppliers, including Plantronics, Western Electric Co. awarded to Roanwell a contract to supply headsets of this design for use in the Bell System.

### The differences between the claimed invention and the prior art

The Plantronics MS–43 and the headset shown in Telex's Flygstad patent each anticipate the complete combination claimed in Claim 1 of the Hutchings utility patent, except for a reversal of parts: the microphone and voice tube are at the top of the capsule and the re-

ceiver and ear tube are at the bottom, instead of vice versa.

The reverse arrangement was old in the hearing aid art. The German patent shows a hearing aid having the microphone and voice tube at the top of the capsule and the receiver and ear tube at the bottom.

*The level of ordinary skill in the art*

No significant technical problem was involved in transposing the positions of the voice and ear tubes. Plantronics argues that the increase in the length of the voice tube from about 4″ to about 6″, which is necessitated by extending the tube obliquely downwardly from the top of the ear to the mouth instead of horizontally from the bottom of the ear, would increase the attenuation to a degree which the art would have considered intolerable prior to Hutchings.

I do not believe that audio technicians would have considered the mere 1 or 2 decibels of added attenuation a significant obstacle. For example, in Bell Labs' concha-mounted Model 61, the voice tube extended from the center of the auricle, a distance almost as great as in Hutchings. Moreover, its outer end was covered by a coil spring having spaced helical windings serving as a puff shield, and just inside its outer end the tube was filled by a disc of porous material, such as sintered stainless steel, to damp any standing wave resonance peaks. These accessories would obviously attenuate the sound waves far more than the mere two inches or so of added length which Plantronics asserts would have deterred the art from adopting an over-ear routing for the voice tube.

█ Of course, it does not negate patentable invention merely to establish that a desirable goal, *once perceived,* could have been reached by the exercise of routine skill. Patentable ingenuity may be involved in the perception of the goal. See *Timely Products Corp. v. Stanley Arron, supra.*

Thus we must turn to the "secondary considerations" for guidance in resolving the issue of obviousness.

*The history of the art*

The history of Hutchings · of course begins with the history of Larkin. Virtually as soon as the MS–50 hit the market, there were suggestions from a number of sources that a similar capsule supported on the ear, like a hearing aid, would avoid the necessity of wearing an eyeglass frame or a headband. Several others actually developed such devices, using post-auricular hearing aid capsules as a starting point, just as Hutchings did. There were only four possible combinations of voice and ear tube arrangements: both out the top, both out the bottom, the voice tube out the top and the ear tube out the bottom, and vice versa.

The choice apparently depended on the particular hearing aid used. Audiotone started with its Model 77, which had the ear tube at the top and the microphone at the bottom, so in designing the MS–43, naturally found it simpler to extend the voice tube below the ear. One starting with the hearing aid of the German patent would presumably have done the opposite.

After its brief venture with the MS–43, which ended in 1962, Plantronics abandoned all effort to develop a post-auricular headset until the end of December 1968 when, apparently spurred by the threat of competition from Bell Labs' earmold-supported Model 61, it organized a "task force" to reactivate the project. Within a week thereafter, Hutchings had completed sketches of a new design and within another month a working prototype had been completed. This design, which was commercialized as the MS–80 "StarSet," was similar to the MS–43, except that the parts were reversed, with the microphone and voice tube at the top and the receiver and ear tube at the bottom.

Bringing the ear tube out the bottom affords an obvious advantage in stability, since the stiffness of the tube and the fixation of its end plug in the ear canal resists swinging of the lower end of the capsule either outwardly away from the

plane of the head or rearwardly away from the back of the ear.

However, this enhanced stability has proved of only limited significance insofar as concerns marketability. Roanwell's R–71, which has an under-ear voice tube and is accordingly not charged to infringe either of the Hutchings patents, has enjoyed and still enjoys substantial commercial acceptance in the face of direct competition from Plantronics StarSet and Roanwell's own R–70, both of which have over-ear voice tubes. Indeed, Roanwell's total sales of the R–70 and R–71 are roughly equal, while its sales of the R–71 to users other than Western Electric, which has standardized on the StarSet and uses Roanwell only as a second source, are roughly 6 times as great as its sales of the R–70.

One apparent reason for the continued popularity of the R–71 is that its under-ear voice tube and low-slung capsule create much less interference with eyeglasses and sunglasses.

Thus most of the "signposts" which pointed toward patentability in the case of Larkin are either missing altogether in the case of Hutchings or point in the opposite direction. The record as to Hutchings establishes no long-felt need, no fruitless search, no defiance of ancient prejudices, no instant acclaim, no driving of competitors from the market.

Plantronics urges that Roanwell's flagrant plagiarism of the StarSet is persuasive evidence of patentability. The record does disclose a driving curiosity on the part of Roanwell concerning the "second generation headset" which Plantronics had announced in its quarterly report to stockholders published in the spring of 1969. Immediately thereafter, Roanwell's Vice President Potter, stating that Roanwell "must find out what it is —soon," marshalled a number of Roanwell's personnel in a well-coordinated program of intelligence-gathering which involved interviewing Plantronics' customers and suppliers and even one of its engineers, the latter on the pretext of exploring his availability for employment, and arranging for third parties, posing as potential customers, to make inquiries to Plantronics.

These efforts met with only limited success; Roanwell apparently learned that Plantronics' "second generation headset" employed a post-auricle capsule, but did not discover such details as the over-ear voice tube. Nevertheless, when Roanwell engaged the assistance of Unex Labs in the development of what one of its salesmen candidly termed a "me-too" version, Unex's exploratory sketches included one model having an over-ear voice tube and an under-ear ear tube. It was not until several days later, at an industry show, that the Plantronics StarSet was first publicly disclosed and Roanwell learned the full details of its construction.

■ When Roanwell finalized the design of its R–70, it doubtless did so conscious of its similarity to the StarSet but, even if it had not already considered the same configuration, among others, before it ever saw the StarSet, it could not be prevented from copying the design of a competitive product on the market, in the absence of a valid patent covering it, or of confusion as to the source of the goods. *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964).

■ Plantronics further stresses the commercial success of the StarSet as evidence of non-obviousness. But commercial success, while indeed a makeweight for patentability, cannot tip the balance against such heavy evidence of obviousness. *Julie Research Laboratories, Inc. v. Guildline Instruments, Inc.*, 501 F.2d 1131, 1135 (2d Cir. 1974); *Formal Fashions, Inc. v. Braiman Bows, Inc.*, 369 F.2d 536, 539 (2d Cir. 1966).

I conclude that all of the claims of the Hutchings utility patent are invalid under 35 U.S.C. § 103.

## B. FRAUD ON THE PATENT OFFICE

Roanwell urges that the Hutchings utility patent is invalid on the further ground that Hutchings and his attorney misled the Patent Office examiner 1) by arguing that Hutchings was the first to provide an over-ear voice tube, while failing to mention that in his early work Hutchings had used an Oticon post-auricular hearing aid which had a short, curved microphone tube extending from the top of the housing to the focus of the auricle and 2) by arguing that the attachment of the voice tube at the top of the housing would cause the weight of the forwardly extending tube partially to counterbalance the weight of the housing and thus enhance stability, whereas 1) the tube is too light to have any significant counterbalancing effect, 2) the counterbalancing effect of the tube is the same whether it is attached to the top or bottom of the housing, and 3) counterbalancing actually reduces stability by producing a see-saw effect.

Hutchings' failure to mention the Oticon device was surely not for the purpose of deception. As already discussed, the examining division was intimately familiar with the hearing aid art, and doubtless was aware that many of the commercial devices then available had microphone ports at the top of the housing and even tubes extending to the focus of the auricle. But this is not the same as a voice tube cantilevered from the housing and extending some six inches to a point adjacent the wearer's mouth.

Hutchings' arguments about the counterbalancing effect of the voice tube were apparently wrong but surely the result of innocent mistake rather than a conscious effort to mislead a technically trained Patent Office examiner about a matter of elementary mechanics.

■ In the absence of either an intent to deceive or recklessness, the patent is not invalid for fraud. *Xerox Corp. v. Dennison Mfg. Co., supra.*

## C. DOUBLE PATENTING

Roanwell argues that the Hutchings utility patent is invalid for the further reason of double patenting, in that the invention claimed is merely the arrangement of the various parts, which is the same subject matter covered by the Hutchings design patent also in suit.

I do not agree. The two patents do not cover the same invention. It is easy to visualize many devices which would infringe the utility patent, yet would create an entirely different visual impact than the patented design; likewise, although it is not so easy, it is possible to conceive useful devices which would embody the design but which would not infringe the utility patent—for example, using a sub-miniature microphone at the end of a boom, having approximately the same overall shape as the voice tube.

The utility patent is therefore not invalid for double patenting. *Mathieu v. Mitchell Vance Co.,* 7 F.2d 837 (2d Cir. 1925); *Bayley & Sons, Inc. v. Standart Art Glass Co.,* 249 F.478 (2d Cir. 1918).

## III. THE HUTCHINGS DESIGN PATENT

■ The Hutchings U.S. patent No. Des. 218,173 (the Hutchings design patent) was issued July 28, 1970 on an application filed June 16, 1969 and covers the headset design shown below in the patent drawing and in a photograph of the Plantronics MS–80 StarSet which embodied this design:

Plantronics Model 50–80 StarSet

The design patent is charged to be infringed by the Roanwell R–70 headset:

Roanwell denies infringement and asserts, as affirmative defenses, that the patent is invalid on the grounds of obviousness, non-ornamentality or functionality and fraud on the Patent Office.

## A. PRELIMINARY INQUIRIES
### *The prior art*

The following illustrations show the closest items of prior art relied on by Roanwell:

*Flygstad U.S. patent 3,280,273 (1966):*

Ex. R-1

---

*Weiss U.S. patent 3,019,306:*

fact that all of the edges seen in elevational view, excepting only the ear-fit inner curve, are substantially planar; 2) the narrowed hook-like prong projecting inwardly from the under side of the forward projection at the upper end of the housing; and 3) the wide metal ferrule at the outer end of this rather long, straight cylindrical projection, with the voice tube extending axially from it.

None of these three features is precisely shown in any of the prior art patents or publications in evidence.

Weiss has a flat top which adjoins the back at a relatively sharp angle; but the back is curved so as to be spaced equidistantly from the ear-contour inner surface. Flygstad has a metal ferrule around the voice tube, but it is narrow and it completely covers a short cylindrical projection.

Moreover, none of the prior art designs creates the same overall visual impression. To some viewers, their appearance may be just as pleasing. But Roanwell has chosen a design which is clearly much

### The differences

Plantronics emphasizes, as novel features of the patented design, 1) the "angular" appearance resulting from the

closer to that of the "StarSet" than to the prior art. So close, in fact, that the conclusion of deliberate copying seems inescapable.

## B.  INFRINGEMENT

The only significant differences between the patented design and the R–70 reside in the lengths of the several side sections and of the cable plug. In the patented design, the back section is slightly longer and the adjoining sections are slightly shorter. The plug is also shorter, which leaves substantial portions of the back section exposed above and below the plug. In the R–70, the longer plug completely covers the shorter back section. But these differences are minor in comparison to the many similarities. The overall visual effects of the two are strikingly similar.

Roanwell's designated deponent, Hans Mol, in comparing the patented design with that of the R–70, admitted that, "To the average layman they would look substantially the same."

This satisfies the test of design patent infringement laid down by the Supreme Court in *Gorham v. White,* 81 U.S. 511, 14 Wall. 511, 20 L.Ed. 731 (1872), namely whether "in the eye of the ordinary observer, given such attention as a purchaser usually gives, two designs are substantially the same." The same test has been applied in this Circuit. *International Silver v. Pomerantz,* 271 F.2d 69 (2d Cir. 1959).

I find that the R–70 infringes the Hutchings design patent.

## C.  FUNCTIONALITY

The prong and the ferrule are clearly functional. Indeed their only apparent *raison d'etre* is utility and not decoration. The prong hooks over the upper front edge of the auricle to prevent the housing from falling off the back of the ear. Even the narrowing of the prong serves the obvious utilitarian purpose of fitting comfortably into the narrower lower portion of the space between the upper front edge of the auricle and the surface of the head. The ferrule fits over the end of the forward projection on the housing and is provided with a bayonet slot engaging a pin on the projection for removably attaching the voice tube to the housing.

Omitting these clearly functional features leaves the "angular" look as the only purely decorative feature.

I am not persuaded by Roanwell's argument that the angular look is also functional because the square microphone fits precisely into the relatively sharp right angle at the upper outside corner of the housing. When the microphone is oriented to achieve this fit, its two opposite sides are angled away from the inner surface of the housing, with a resulting wastage of interior space. The spatially most economical shape of the housing would obviously be one in which the outside surface is "parallel" to— i. e., equidistant from—the inner surface and the microphone is oriented so that two of its opposing flat surfaces are aligned as closely as possible with both the inner and outer surfaces of the housing.

The angular contour of the upper corner of the housing is thus anti-functional and defiantly decorative.

## D.  OBVIOUSNESS

Unfortunately, in an action for infringement of a design patent there are rarely any of the "signposts" of patentability which enable an objective evaluation of the obviousness *vel non* of utility inventions. Since the design patent covers only optional esthetic features, there is never a long-felt need or an unsuccessful search, and it is rarely possible to allocate the specific portions of the profits on a commercial product which are respectively attributable to its utilitarian advantages and to its visual appeal. Thus, in the final analysis, a court's evaluation of the patentability of a design is essentially subjective and personal artistic tastes

are unpredictable and inexplicable—one viewer's mural is another's graffiti.

Giving a functionally curved device an "angular" look by straightening its surfaces is a device almost as old as the art of design itself. A rectangular wrist watch case is but one of a legion of examples that could readily be called to mind. But there likewise is an endless variety of different ways in which the headset housing could be given an "angular" look—an infinite permutation of the number of planar side sections, of the ratios of their respective lengths, and of the angles between them. The particular combination chosen by Hutchings is pleasing enough, but no more so than any of thousands of others which he might have chosen. I cannot believe that any artistic talent beyond that of a designer of ordinary skill in the art was required. The record does not reflect that Hutchings had any design training or experience whatever. Of course, this by no means disqualifies him to receive a design patent. Doubtless there are many potential Rembrandts whose hands have been fated to hold scalpels or even shovels rather than paint brushes. But it is at least some evidence that only routine skill was involved in his design of the StarSet housing.

Moreover, if there could be any patentability in the design, it would have to reside not in the broad and notoriously old concept of "angularity" but in the particular number of planar side sections and of the ratios of their respective lengths. As already noted, while the Roanwell R-70 housing has the same number of side sections, it has a shorter back section and longer adjoining sections than the Hutchings design, and the plug covers the entire back section. If the Hutchings patent were given a sufficiently narrow interpretation to preserve its validity, it would not be infringed by the R-70.

I conclude that the Hutchings design patent is invalid for obviousness under § 103.

### E. FRAUD ON THE PATENT OFFICE

■ Roanwell contends that, after the Patent Office examiner failed to cite against the application for the design patent any prior art showing post-auricle headsets, Hutchings and his attorney should have called to his attention the Flygstad patent of which they were well aware and which they had called to the attention of the examiner handling the application for the Hutchings utility patent.

I do not find that this failure amounted to fraud. The Hutchings design application did not cover post-auricle headsets *per se*, but only the specific design shown. Flygstad's headset embodied an entirely different design with a long curved back surface merging smoothly with a more abruptly curved bottom surface. It lacks the angular appearance which characterizes the patented design. Its citation to the Patent Office would not likely have affected the prosecution of the Hutchings application, and its withholding was apparently without any deceptive intent.

### IV. ATTORNEY'S FEES

■ Both parties have sought an award of their attorney's fees. However, I find nothing which renders this case "exceptional" within the contemplation of 35 U.S.C. § 285. None of the plaintiff's claims and none of the defenses was sham or frivolous; all were clearly asserted in good faith and with obvious conviction; the trial was conducted expeditiously and with great skill on both sides; and, typically of the patent trial bar, counsel were not only courteous, but admirably cooperative in discovery and in entering into stipulations of fact which materially shortened the trial. No attorney's fees are awarded.

### V. SUMMARY

Claim 1 of the Larkin patent is valid and infringed by the Roanwell R-70 and R-71 headsets. All of the claims

of the Hutchings utility patent are invalid. The Hutchings design patent is invalid but, if valid, would be infringed by the Roanwell R–70 headset.

Plantronics is entitled to an injunction restraining further infringement of Claim 1 of Larkin for the remainder of the term thereof and, if the parties cannot compromise the matter, to an accounting of damages for past infringement.[3] Plantronics' counsel should prepare a proposed judgment order and submit it to Roanwell's counsel for approval as to form.

3. In connection with Plantronics' claim for treble damages, I find that Roanwell's infringement of the Larkin patent was not deliberate and willful because Roanwell relied upon the advice of able outside counsel that all of the claims of the patent which did not recite the mask were invalid. Following the trial, Plantronics moved to strike the portion of Roanwell's answer which alleges that it acted upon the advice of counsel, on the ground that Roanwell did not offer at the trial any evidence to support that allegation but instead asserted an attorney-client privilege with respect to all communications between it and its attorneys. I find, to the contrary, that Roanwell did introduce, as defendants' Exhibit KK, a letter dated August 19, 1965 from its patent counsel advising that the Larkin patent is invalid in view of the prior Pritchett and Dreher patents.